UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

BIRDA TROLLINGER, VIRGINIA       )
BRAVO, KELLY KESSINGER,          )
IDOYNIA MCCOY, REGINA LEE,       )
PATRICIA MIMS, LORI WINDHAM      )
and ALEXANDER HOWLETT,           )
individually and on behalf of all others )
similarly situated               )
                                 )
          Plaintiffs,            )
                                 )
     v.                          )
                                 )
TYSON FOODS, INC., JOHN TYSON,   )
ARCHIBALD SCHAFFER III, RICHARD, )          No. 4:02-CV-23
BOND, KENNETH KIMBRO, GREG       )
LEE, KAREN PERCIVAL, AHRAZUE     )          Chief Judge Curtis L. Collier
WILT and TIM MCCOY,              )
                                 )
          Defendants.            )

**<u>MEMORANDUM</u>**

Before the Court is Defendants Tyson Foods, Inc., John Tyson, Archibald Schaffer III,

Richard Bond, Kenneth Kimbro, Greg Lee, Karen Percival, Ahrazue Wilt, and Tim McCoy's

(collectively, "Defendants" or " Tyson")' motion to dismiss (Court File No. 259) filed on March 2,

2007. Plaintiffs Birda Trollinger, Virginia Bravo, Kelly Kessinger, Idoynia McCoy, Regina Lee,

Patricia Mims, Lori Windham and Alexander Howlett (collectively "Plaintiffs") filed a response

(Court File No. 282), and Defendants filed a reply to Plaintiffs' response (Court File No. 288).

Recently, Plaintiff filed a supplemental brief (Court File No. 307) to inform the Court of the recent

decision in *Brewer v. Salyer*, No. CV F 06-01324, 2007 WL 1454276 (E.D. Cal. May 17, 2007)[1],

and Defendants, in turn, filed a response to Plaintiffs' supplemental brief (Court File No. 308).

After carefully considering the arguments of counsel and the applicable law, the Court will **DENY**

Defendants' motion to dismiss (Court File No. 259).

## I.    <u>STANDARD OF REVIEW</u>

Although Defendants do not state the theory under which they bring this motion, the Court

considers it being brought pursuant to Fed. R. Civ. P. 12(b)(6).  A motion to dismiss pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires the Court to construe the complaint

in the light most favorable to the plaintiff, *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998); *State*

*of Ohio ex rel. Fisher v. Louis Trauth Dairy, Inc.*, 856 F.Supp. 1229, 1232 (S.D. Ohio 1994), accept

all the complaint's factual allegations as true,  *Bloch*, 156 F.3d at 677; *Broyde v. Gotham Tower,*

*Inc.*, 13 F.3d 994, 996 (6th Cir. 1994), and determine whether "it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*

*v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12

(6th Cir. 2001); *Cameron v. Seitz*, 38 F.3d 264, 270 (6th Cir. 1994); *Broyde*, 13 F.3d at 996; *Meador*

*v. Cabinet for Human Resources*, 902 F.2d 474, 475 (6th Cir. 1990), *cert. denied*, 498 U.S. 867

(1990); *Phillips v. Capital Toyota, Inc.*, No. 1:05-CV-215, 2006 WL 1408688, at *1 (E.D. Tenn.

May 22, 2006); *Coffey v. Chattanooga-Hamilton County Hosp. Auth.*, 932 F.Supp. 1023, 1024 (E.D.

Tenn. 1996).   The Court may not grant such a motion to dismiss based upon a disbelief of a

---

[1]The *Brewer* court addressed a motion to dismiss a complaint similar to the one in this case, and the motion was based on similar grounds as the one the defendants in this case have filed.

complaint's factual allegations. *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995) (noting courts should not weigh evidence or evaluate the credibility of witnesses); *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990). The Court must liberally construe the complaint in favor of the party opposing the motion. *Miller*, 50 F.3d at 377; *Louis Trauth Dairy, Inc.*, 856 F.Supp. at 1232.

In deciding a motion to dismiss, the question is "not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). However, bare assertions of legal conclusions are insufficient. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). The "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Id.* The purpose of a motion pursuant to Fed.R.Civ.P. 12(b)(6) is to allow the defendant to test whether, as a matter of law, the plaintiff is entitled to the legal relief sought even if all the allegations in the complaint are true. *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).

## II.    RELEVANT FACTS AND PROCEDURAL HISTORY

This case commenced when Plaintiffs filed their complaint on April 2, 2002 (Court File No. 1). Subsequently, Plaintiffs filed amended complaints with the latest filed on June 24, 2005 (the Court will simply refer to the latest filed complaint as "Complaint") (Court File No. 3, Plaintiffs' First Amended Complaint; Court File No. 115, Plaintiffs' Second Amended Complaint). In each complaint, Plaintiffs allege a cause of action based upon the civil provisions of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964.[2] Plaintiffs' RICO cause of action is based upon 18 U.S.C. § 1962(c),[3] which makes it unlawful to conduct the affairs of a RICO enterprise through a pattern of racketeering, and § 1962(d)[4], which makes it unlawful to conspire to commit a RICO violation. Racketeering activities are defined in 18 U.S.C. § 1961.

Plaintiffs rely upon § 1961(1)(F) which defines a racketeering activity as "any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain." Specifically, Plaintiffs allege a pattern of racketeering activity consisting of predicate racketeering acts of knowingly hiring 10 illegal aliens, during any 12-month period,[5] and illegally harboring illegal

---

[2]Section 1964(c), Title 18, United States Code, provides: "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."

[3]Section 1962(c) provides: "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

[4]Section 1962(d) provides: "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

[5]Knowingly hiring 10 or more illegal aliens in a 12-month time period is made an offense by 8 U.S.C. § 1324(a)(3)(A)-(B), which provide:

(A) Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under Title 18 or imprisoned for not more than 5 years, or both.

aliens.[6]  Both of these activities are made unlawful by 8 U.S.C. § 1324.

Defendants have filed two previous motions to dismiss or for judgment on the pleadings (Court File Nos. 11, 162).[7]  The relevant facts in this case were previously summarized by the Court

---

(B) An alien described in this subparagraph is an alien who–

    (i) is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and
    (ii) has been brought into the United States in violation of this subsection.

[6]Bringing into the United States, transporting, encouraging, harboring and other acts of assistance to illegal aliens is made an offense by 8 U.S.C. § 1324(a)(1)(A), which provides:

Any person who--

    (i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;
    (ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;
    (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;
    (iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or
    (v)(I) engages in any conspiracy to commit any of the preceding acts, or
    (II) aids or abets the commission of any of the preceding acts,

shall be punished as provided in subparagraph (B).

[7]The Court does not discern anything in this latest motion to dismiss that was not known at the time the earlier motions were filed.  Plaintiffs' theory has remained the same, and there has been no change in the law.  Even though this motion could and should have been filed earlier, the Court agreed at the Management Conference to entertain this motion.  However, unless compelling reasons dictate the Court do so, the Court will not accept any additional motions to dismiss the complaint or motions on the pleadings as a matter of law unless it can be clearly established the grounds for

5

in the Memorandum (Court File No. 174) explaining the Court's reasoning supporting its decision on the Defendants' most recent motion for judgment on the pleadings. The Court does not deem it necessary to restate the facts here but will refer to the facts stated in that memorandum as necessary.

In this motion, Defendants seek dismissal of the Complaint because Defendants allege the Complaint fails to allege a necessary RICO predicate act, that is, Defendants "'knowingly hire[d] for employment at least 10 individuals *with actual knowledge*' that the individuals are 'unauthorized' aliens *and* that those aliens were 'brought into the United States in violation [8 U.S.C. § 1324],'" and the Complaint fails to allege a viable RICO enterprise (Court File No. 259, Defendants' Motion to Dismiss ("Def.'s MTD"), at p. 7-8).

III.    **ANALYSIS**

A.      **The Complaint**

The proper starting point in the analysis is to examine the allegations contained in the Complaint. Next, the Court must compare those allegations with the requirements of the law as stated above.

The second amended complaint is sixteen pages in length and attempts to set out the essence of Plaintiffs' claims. The Complaint alleges Defendants "knowingly hir[ed] a workforce

---

such a motion could not have been known prior to the Management Conference. In their response, Plaintiffs contend this motion should not have been brought considering the decision of the Sixth Circuit in *Trollinger v. Tyson Foods, Inc*., 370 F.3d 602 (6th Cir. 2004). According to Plaintiffs, the *Trollinger* opinion constitutes the law of the case since the issues raised in the present motion were expressly or impliedly decided by the appellate court and absent extraordinary conditions, that decision cannot be disregarded.

substantially comprised of undocumented illegal immigrants for the express purpose of depressing wages." Compl. at ¶2. Beginning on page 5, the Complaint details what Plaintiffs allege Defendants did to subject them to liability. Under the heading "The Illegal Immigrant Hiring Scheme: Tyson Requires Its Hiring Personnel To Be Willfully Blind And Subvert The Law Against Hiring Unauthorized Immigrants," the Complaint alleges Defendants "engaged in a long-term pattern and practice of violating [the Immigration Reform and Control Act[8]] and § 274 of the Immigration and Nationality Act, 8. U.S.C. § 1324(a)(3)(A) . . . ." Compl. at ¶24. In support of the allegation Defendants engaged in a pattern and practice of violating and subverting the law, the Complaint states Tyson signs Employment Eligibility Verification Forms (I-9 forms) in mass quantities before any documents are inspected, more than three days after new hires have been employed, and based upon a review of copies of documents rather than reviewing the original documents. *Id*. at ¶24(a). The Complaint further alleges Tyson prohibits its employees from taking into account obvious facts which indicate that documents do not relate to the people tendering them; rehires persons whom it previously hired under different names, usually after a short absence; hires workers who appear decades younger than the pictures on their stolen identity documents; uses temporary employment placement services to hire illegal immigrants and then "loan" them to Tyson for a fee; and gives employees leave to "get good documents" after Tyson learns the initial documents submitted by the illegal alien actually belong to someone else; these employees are then rehired under the new identities, but often retain their seniority based upon their initial hire date. *Id*. at ¶24(b)-(f). According to the Complaint, Tyson supervisors often asked those employees, "Who are you this week?" *Id*. at ¶24(f). Plaintiffs also allege Tyson provided new hires with money

_____

[8]Immigration Reform and Control Act ("IRCA"), 8 U.S.C. § 1324(a) et seq.

to obtain housing, food, and other living supplies as well as transportation to and from Tyson facilities. *Id*. at ¶24(g). Plaintiffs allege the described policy was implemented by Tyson's Senior Vice President of Human Resources in the late 1980's and has been approved by all Defendants. *Id*. at ¶25.

In the next section of the Complaint, "Tyson Uses The Basic Pilot Program As A Fig Leaf To Subvert IRCA," Plaintiffs claim Tyson "has used the federal government's Basic Pilot Program[9] in order to give the appearance of complying with IRCA while the company is actively subverting the law." *Id*. at ¶26. The Complaint alleges Basic Pilot "does *not* establish that the person presenting the documents is the issuee." *Id*. at ¶27. According to the allegations, Tyson does not verify its employees are not illegal aliens. "Thus, Tyson is abusing Basic Pilot to subvert its IRCA obligations, turning the program into a fig leaf to ward off future raids and enforcement actions." *Id*.

Following this section, the Complaint details what it says is the story of one illegal alien improperly using the name, social security number and birth certificate of a United States citizen named Dalia Gutierrez. Plaintiffs allege Tyson learned this person was an illegal alien and conducted an investigation. Compl. at ¶31. Following the investigation, Tyson simply accepted another set of documents in the name of Dalia Gutierrez. *Id*. This section further alleges "Tyson has hired hundreds of 'Dalia Gutierrez' workers at each of the facilities each year since 1996 in the same manner. In every case, Tyson's hiring personnel knew that the workers were unauthorized for employment but still employed the workers, pursuant to the Illegal Immigrant Hiring Scheme,

---

[9]Basic Pilot is a program that allows an employer to check an employee's employment authorization.

established by the individual defendants." *Id*. at ¶33.

On page 8 of the Complaint, under the heading "Tyson Harbors Illegal Immigrants," the Complaint says numerous Tyson facilities have been raided or investigated by federal immigration authorities. *Id*. at ¶34. It goes on to allege when Tyson hears rumors of an impending raid, "Tyson supervisors tip off known illegal immigrants and recommend they leave the plant." *Id*. The Complaint also alleges "Tyson rents trailers and other cheap housing units for its illegal workers, typically through front companies. It uses fronts because many landlords refuse to rent housing to Tyson, knowing it will be used to harbor illegal immigrants. This is particularly prevalent in the area of northern Alabama know as 'Little Tijuana,' where the facilities in that state are located. This is another widespread method of harboring illegal immigrants." *Id*. at ¶35.

Following these factual allegations, the Complaint sets out two Racketeering Acts, (1) knowingly hir[ing] more than 10 unauthorized, illegal immigrants each year, since the enactment of § 1324(a)(3)(A), in each facility, and (2) violating § 1324(a)(1)(A)(iii), by harboring unauthorized, illegal immigrants with knowledge or reckless disregard that each illegal immigrant entered the United States illegally. *Id*. at ¶¶36-37. Plaintiffs allege Tyson's hiring of the illegal aliens constitutes harboring as well as Tyson's actions in shielding the illegal aliens from detection by federal immigration officials and its actions in providing the illegal aliens with housing. *Id*. at ¶37.

In the next major heading, "The RICO Enterprises," the Complaint sets out three separate collectives it alleges constitute enterprises under the RICO statute. First, it alleges Tyson's association with certain temporary employment services constitutes a RICO enterprise. Compl. at ¶¶39-45. Second, it alleges the individual defendants entered into a conspiracy to carry out the

alleged Illegal Immigrant Hiring Scheme. *Id*. at ¶¶46-48. These individual defendants agreed this scheme would be conducted through Tyson, "which is an enterprise." *Id*. at ¶48. Finally, Plaintiffs allege Tyson and certain "Hispanic Groups" formed an association-in-fact RICO enterprise. *Id*. at ¶¶49-56.

### B. Tyson's Motion to Dismiss

#### 1. *Mens Rea* For A Predicate Hiring Offense Under RICO

Tyson argues the Complaint is deficient because it fails to allege a sufficient mens rea. Defendants argue the predicate acts here require a heightened showing of scienter, and Plaintiffs have failed to plead that heightened scienter. Defendants also argue § 1324(a)(3), requires both that a defendant knowingly hire at least 10 individuals with actual knowledge the illegal aliens were unauthorized aliens, and the aliens were brought into the United States in violation of § 1324. In other words, in addition to knowledge the alien was an unauthorized alien, the defendant must also have knowledge the illegal alien had been smuggled into the United States or had evaded lawful entry.

Defendants cite to *Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc*., 271 F.3d 374, 387 (2d Cir. 2001) and *Sys. Mgmt., Inc. v. Loiselle*, 91 F. Supp. 2d 401, 408-09 (D. Mass. 2000), in support of their argument. In *Commercial Cleaning* the court held that a complaint was deficient in failing to allege the defendant had actual knowledge that the illegal aliens it hired were brought into the United States in violation of § 1324(a). 271 F.3d at 387. The panel in *Commercial Cleaning* relied upon *Loiselle*. The district court in *Loiselle* concluded that a civil RICO claim premised upon § 1324(a)(3)(B)(ii) requires that a plaintiff allege the defendant had knowledge of how the illegal aliens had been brought into the United States and that the illegal aliens were brought

into the United States in violation of this provision. 91 F. Supp. 2d at 408-09.

These are the only two cases to adopt this position. Defendants properly brought to the Court's attention the contrary authority of *Williams v. Mohawk Indus., Inc.*, 314 F. Supp. 2d 1333 (N.D. Ga. 2004), *aff'd in part, rev'd in part and remanded* 411 F.3d 1252, *cert. granted in part* 126 S.Ct. 830, 163 L.Ed.2d 705, *miscellaneous rulings* 126 S.Ct. 1671, 164 L.Ed.2d 395, *cert. dismissed as improvidently granted* 126 S.Ct. 2016, 164 L.Ed.2d 776, *on remand to* 465 F.3d 1277, *cert. denied by* 127 S.Ct. 1381, 167 L.Ed.2d 174. In that case, the district court applied the liberal pleading standards of Fed. R. Civ. P. 8 to a RICO action involving non-fraud, immigration offenses as predicate activities, and not heightened pleading requirements of Rule 9(b).

Generally, in federal courts only liberal notice pleading is required. Fed. R. Civ. P. 9(b) provides, "Malice, intent, knowledge and other conditions of mind of a person may be averred generally." Plaintiffs cite *Vector Research, Inc. v. Howard & Howard Attorney's P.C.*, 76 F.3d 692, 700 (6th Cir. 1996), in which the court reversed the dismissal of the complaint where the district court imposed a heightened pleading standard, requiring "facts" to establish "malice." *See also Hernandez v. Balakian*, - - - F. Supp. 2d - - -, 2007 WL 926813, at *7 (E.D. Cal. Mar. 27, 2007) (denying the defendants' motion to dismiss a RICO action due to a suggestion in *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002) that "the Ninth Circuit will not require the specific pleading mandated by *Loiselle* with regard to pleading the predicate act set forth in Section 1324(a)(3)" and the requirements of notice pleading).

Except in limited circumstances, Rule 8 dictates the pleading requirements of a complaint. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit et al.*, 507 U.S. 163, 168 (1993). "Rule 8(a)(2) requires that a complaint include only 'a short and plain statement of the

claim showing that the pleader is entitled to relief.'" *Id*. While Rule 9(b) requires greater particularity in pleading certain actions, RICO actions are not included in Rule 9, and as such, can be pled according to Rule 8 standards. *See id*. (reversing the Fifth Circuit's requirement of heightened pleading in cases alleging municipal liability, stating, "the Federal Rules do address in Rule 9(b) the question of the need for greater particularity in pleading certain actions, but do not include among the enumerated actions any reference to complaints alleging municipal liability under [42 U.S.C.] § 1983."). *See also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) (holding an employment discrimination complaint need not contain specific facts establishing a prima facie case since imposing a heightened pleading standard would conflict with Fed. R. Civ. P. 8(a)(2), which provides a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief"). Under *Leatherman* and *Swierkiewicz*, federal courts may not impose more onerous pleading standards than found in the Federal Rules of Civil Procedure. Based upon *Leatherman*, *Swierkiewicz*, and the reasoning of *Williams*, this Court will use the liberal pleading standard of Rule 8(a) and ascertain whether "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz*, 534 U.S. at 514 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

By its terms, section 1324(a)(3)(A) requires a defendant to knowingly hire at least 10 individuals with actual knowledge these individuals have been brought into the United States in violation of section 1324(a)(3). As far as the Court can ascertain, no other court has addressed this argument. While courts have held that knowledge of the illegal alien's status is an essential element of the offenses of harboring and concealing an alien under section 1324(a)(1), *United States v. Mack*, 112 F.2d 290 (2d Cir. 1940), there are few courts that have addressed with any precision the

meaning of the language "has been brought into the United States." Perhaps the most extensive

discussion was given in *United States v. Yoshida*, 303 F.3d 1145, 1151-52 (9th Cir. 2002). There,

the Ninth Circuit stated, after a detailed analysis of IRCA's change to 8 U.S.C. § 1324(a)(2), that

"[t]he statute itself conclusively indicates that Congress intended a broad definition of bring: brings

to or attempts to bring to the United States *in any manner whatsoever*." *Id.* at 1152 (emphasis in

original) (internal quotations omitted). Applying this standard, the *Yoshida* court held that escorting

aliens to a commercial airliner, which then transported them to the U.S. and through a port of entry

at a U.S. airport, was sufficient to violate the statute. *Id.*

Defendants argue this language necessarily must be limited to subsection (a)(1)(A)(i) and

does not include the prohibitions in the other subsections.[10] Assuming Defendants are correct, the

question then becomes have Plaintiffs either directly or inferentially alleged Defendants knowingly

hired illegal aliens and hired them with actual knowledge the illegal aliens had been brought into

the United States "in any manner whatsoever . . . at a place other than a designated port of entry or

place other than as designated by the Commissioner . . . ." § 1324(a)(1)(A)(i). There is no

requirement that the Defendant be the one who brought the illegal alien into the United States. Thus,

for a plaintiff to plead a violation of the statute prohibiting employment of unauthorized aliens, as

---

[10]Although Defendants focus on section 1324(a)(1)(A)(i), subsections (a)(1)(A)(ii) through (a)(1)(A)(v) prohibit other illegal immigration related activities. Defendants are correct 1324(a)(1)(A)(i), contemplates smuggling. However, § 1324(a)(1)(A)(ii) prohibits transportation of an illegal alien, with knowledge or with reckless disregard of the illegal status of the alien. Section 1324(a)(1)(A)(iii), prohibits concealing, harboring, or shielding from detection, any illegal alien, with knowledge or reckless disregard of the illegal status of the alien. Section 1324(a)(1)(A)(iv), prohibits encouraging or inducing an alien to come to the United States, knowing or in reckless disregard of the fact the illegal alien's coming to, entry, or residence will be illegal. Section 1324(a)(1)(A)(v) makes it unlawful to conspire or to aid and abet any of the prohibitions of sections 1324(a)(1)(A)(i) - (v).

a predicate act in a RICO case, the plaintiff must simply allege that the aliens were brought into the United States for the purpose of illegal employment, but there is no requirement that the employer must have brought the aliens into this country. *Mohawk Industries, Inc*., 314 F. Supp. 2d at 1346.

The Complaint alleges Defendants "engaged in a long-term pattern and practice of violating the IRCA," hired workers who it previously hired under different names, hired workers who appeared decades younger than the pictures on their identity documents, used temporary employment placement services to hire illegal immigrants, and allowed employees leave to get "get good documents" after Tyson learned the original documents submitted actually belonged to someone else. The Complaint alleges Tyson knowingly hires a workforce substantially comprised of illegal aliens. From these allegations one can only conclude that Tyson hires hundreds of these illegal aliens through the alleged process. These allegations are sufficient to allege Defendants knowingly hired unauthorized aliens.

Since the Court has concluded the Complaint adequately alleges Defendants had knowledge of the illegal status of the illegal aliens, the Court must next consider whether the Complaint, directly or inferentially, alleges Defendants had actual knowledge of a violation of § 1324(a)(1)(A)(i). The Court accepts Defendants' formulation of actual knowledge as a subjective belief that something is true. (Def.'s MTD at p. 12) (citing *United States v. One 1973 Rolls Royce*, 43 F.3d 794, 813 (3d Cir. 1994)). *See also Brody v. Village of Port Chester*, et al., No. 00 Civ. 7481, 2007 WL 735022, *6 (S.D.N.Y. Mar. 12, 2007) (stating "actual knowledge refers to a subjective state of mind") (internal quotations omitted).

Using this formulation, the Court will examine the Complaint to see if it contains allegations, either direct or inferential, that indicates a subjective belief on the part of Defendants it employed

illegal aliens that had been brought into the United States illegally. The Court must consider the Complaint as a whole and not limit itself to isolated portions of the Complaint, and the Court must endeavor to give meaning to every word of the Complaint. The Court conducts this examination in the context of the commonly understood problem with illegal immigration in the country. With this context, the Court notes the Complaint alleges Defendants have hired "a workforce substantially comprised of undocumented illegal immigrants for the express purpose of depressing wages"; "[p]rohibiting hiring personnel from taking into account obvious facts which indicate that documents do not relate to the people tendering them"; "[r]ehiring persons whom it previously hired under different names, usually after a short absence during which they have acquired a new, stolen identity"; [h]iring workers who appear decades younger than the pictures that appear on their stolen identity documents"; "[u]sing temporary employment placement services to hire illegal immigrants and then 'loan' them to Tyson for a fee"; "[g]iving employees leave to 'get good documents' after Tyson has been informed their employment authorization documents actually belong to someone else"; "rehiring these employees under new identities but then providing the employees the same seniority as under the old identity"; "Tyson supervisors will often ask these employees, 'Who are you this week?'"; "[g]iving newly hired workers money to obtain housing, food, and other living supplies . . . , as well as providing transportation to and from the Tyson facility, which, when coupled with their inability to speak English," should have placed Defendants on notice these workers were not United States citizens nor lawful permanent residents. Complaint at ¶¶2, 24(b)-(g).

The Complaint goes on to state "[t]he result of Tyson's policies . . . is the knowing employment of thousands of illegal immigrants using stolen identity documents"; "Tyson has hired

hundreds of 'Dalia Gutierrez' workers at each of the facilities each year since 1996 in the same manner"; "[n]umerous Tyson facilities have been raided and/or investigated by federal immigration authorities"; "[w]hen [rumors of immigration raids] spread, Tyson supervisors tip off known illegal immigrants and recommend they leave the plant"; "Tyson rents trailers and other cheap housing units for its illegal workers, typically through front companies"; and an area in northern Alabama, particularly the area where a Tyson facility is located, is known as 'Little Tijuana.'" The reference to Tijuana is an indication the aliens are from Mexico. Assuming these allegations are true, which the Court must do, one can readily conclude Tyson not only hires large numbers of illegal aliens, but actively seeks them out because it realizes it can pay them much less in wages. The illegal alien population sought out is largely if not entirely from Mexico. Tyson knew some number of these illegal aliens were not from the areas surrounding its facilities, for that reason it had to obtain housing for them. From raids on its facilities by Immigration authorities Tyson knew the Government was concerned about its hiring practices. From these raids, Tyson would have learned its work force was not made up illegal aliens that overstayed their visas or who were properly admitted into the United States but then violated their immigration status. From the alleged widespread use of fraudulent documents, Tyson knew it was the ultimate destination of large numbers of illegal aliens seeking employment. From the alleged conduct of its supervisors in joking about false identities, warning illegal aliens of raids, and rehiring individuals after their documents had been determined to be false, Tyson knew it had workers that had been brought into the United States illegally. In the context of the present illegal immigration problem in the United States, it is widely, if not universally, known that illegal immigration from Mexico is done in substantial part through smuggling. It is also of note that Tyson's processing plants are all located in areas where

the predominant illegal alien population is from Mexico. This knowledge along with the above allegations satisfies the requirement that the Complaint alleges Defendants had a subjective belief that large numbers of its illegal alien employees had been brought into the United States illegally.

This conclusion is supported by *Mohawk Industries, Inc.*, 465 F.3d at 1283 (in a complaint very similar to the complaint in this case, the court determined the complaint adequately alleged a pattern of racketeering activity made up of knowingly hiring for employment at least 10 illegal aliens with actual knowledge they were illegal aliens during a 12-month period; concealing, harboring and shielding from detection aliens that entered the United States illegally; and encouraging or inducing an alien to come to, enter, or reside in the Untied States knowing that such coming, entry, or residence, would be in violation of the law), and *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002) ("The complaint [regarding a RICO illegal alien hiring and harboring scheme] alleges that the defendants had knowledge of illegal harboring 'and/or' smuggling. Even if knowledge of smuggling were required by the statute, an issue about which we express no opinion, the complaint easily contains this allegation.").

### 2. Willful Blindness Policy

In an effort to blunt Plaintiffs' allegation Tyson used the Basic Pilot Program as a subterfuge to violate the law, Defendants argued they were obligated to operate as they did to avoid violations of civil statutes and regulations. They cite to certain administrative proceedings to which they were subjected. The Court does not need to devote much time to this. First, Tyson only cites civil statutes and regulations. Here, we are dealing with criminal statutes. To the extent there is a conflict between a criminal and civil statute, obviously the criminal statute prevails. Second, while Defendants argue they operated as they did to avoid civil action by the United States Department

of Justice, they also inform the Court they were prosecuted criminally by the Department of Justice. Obviously, their efforts to comply with the civil requirements were not sufficient to persuade the Department of Justice they had not committed the more serious criminal violations. Finally, the Court is aware of no authority that indicates governmental regulation provides immunity to either criminal or civil liability. To the contrary, it is not unusual for defendants to be subjected to civil lawsuits after substantial governmental regulatory oversight. That occurs frequently with respect to civil actions filed against pharmaceutical companies even though their product had been approved by the Federal Food and Drug Administration. The Court sees nothing in the statutes involved in this litigation that suggest compliance with those statutes provides immunity to defendants.

### 3. Harboring Violation

Tyson asserts the Complaint is deficient because it attempts to allege a Harboring Statute violation by claiming Tyson's unlawful hiring constitutes harboring. Tyson cites to *Susnjar v. United States*, 27 F.2d 223, 224 (6th Cir. 1928) for the proposition harboring means "to clandestinely shelter, succor, and protect improperly admitted aliens." Additionally, Defendants rely on *Zavala v. Wal-Mart Stores, Inc*., 393 F. Supp. 2d 295, 307 (D.N..J. 2005) to argue hiring, without more, does not constitute harboring.

The Court accepts the *Susnjar* court's definition of harboring and finds Plaintiffs' allegations comply with that definition. In addition to alleging Tyson knowingly hired illegal aliens, the Complaint avers Tyson "shielded illegal immigrants from detection by . . . warning them of possible raids and providing them with housing." Compl. at ¶¶ 34-37. Obviously, this alleges more than mere hiring and is sufficient to plead a harboring violation. *See Zavala*, 393 F. Supp. 2d at 307 (noting allegations an employer provided housing and employment may constitute "harboring").

*See also United States v. Zheng*, 306 F.3d 1080, 1086 (11th Cir. 2002) (noting an employer harbored illegal aliens by providing both housing and employment, which facilitated the aliens' ability to remain in the United States illegally).

### 4. RICO Enterprise

Defendants argue Plaintiffs have failed to allege a cognizable RICO enterprise. Specifically, Defendants contend RICO requires plaintiffs to allege Tyson conducted a separate enterprise through a pattern of racketeering activity. Defendants argue all three of the enterprises pled by Plaintiffs are insufficient to allege a RICO enterprise.

The concept of an enterprise is central to a RICO violation. First, RICO makes it unlawful for "any person, through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b). Second, RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). The term enterprise is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Thus, in order to have sufficiently alleged an enterprise, the enterprises identified by Plaintiffs must fit the statute's definition of an enterprise. Furthermore, the defendants must have conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs. Last, the defendants must have done so through a pattern of racketeering activity. The Court will address

Defendants' arguments as to each alleged enterprise in turn.

### a.    The Temporary Employment Services Enterprise

Defendants argue the first enterprise alleged by Plaintiffs, the "Temp Agency Enterprise", fails as a matter of law for two reasons. First, Defendants argue the plain language of the statute provides only a group of individuals may be an association-in-fact enterprise. Second, Defendants contend Plaintiffs have failed to allege any ongoing organization or structure for this enterprise as required by law.

The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") has expressly rejected Defendants' first argument, albeit in a nonpublished opinion. *See United States v. Collins*, Nos. 87-1283 to 87-1286, 87-2038 and 87-2072, 1991 WL 23558, *16 (6th Cir. Feb. 26, 1991) (holding corporations can be "individuals associated in fact."). As noted by the *Collins*' court, other circuits have considered Defendants' interpretation of an association-in-fact enterprise and rejected it. *See Williams v. Mohawk*, 465 F.3d 1277, 1284 (11th Cir. 2006) (holding the plaintiffs' complaint had sufficiently alleged an association-in-fact between a corporation (Mohawk) and third-party recruiters (temp agencies)); *United States v. London*, 66 F.3d 1227, 1244 (1st Cir. 1995) (rejecting the defendant's argument an association-in-fact RICO enterprise cannot be comprised of legal entities); *United States v. Console*, 13 F.3d 641, 652 (3d Cir. 1993) (holding an association-in-fact RICO enterprise existed between a law firm and a medical practice), *cert. denied*, 511 U.S. 1076 (1994); *United States v. Blinder*, 10 F.3d 1468, 1473 (9th Cir. 1993) (holding a group or union consisting solely of corporations or other legal entities can constitute an "associated in fact" enterprise); *United States v. Perholtz*, 842 F.2d 343, 353 (D.C. Cir. 1988) (holding individuals, corporations, and other entities may constitute an association-in-fact).

Most of these decisions rely on the same reasoning, including the fact that "[t]he statute defines 'enterprise' as *including* the various entities specified; the list of entities is not meant to be exhaustive." *Perholtz*, 842 F.2d at 353 (emphasis in original). Furthermore, the Supreme Court's statement that "[t]here is no restriction upon the associations embraced by the definition . . . .", *United States v. Turkette*, 452 U.S. 576, 580 (1981), has led courts to reject restrictive definitions of a RICO enterprise. Indeed, Congress has instructed courts to construe RICO "liberally . . . to effectuate its remedial purposes." Pub.L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970) (reprinted in note following 18 U.S.C. § 1961), quoted in *Turkette*, 452 U.S. at 587). Accordingly, the Court finds Tyson can be a member of an association-in-fact enterprise.

As to Defendants' second argument, the Court finds Plaintiffs have sufficiently pled an ongoing organizational structure of this enterprise. An enterprise is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583. Defendants cite *United States v. Johnson*, 440 F.3d 832, 840 (6th Cir. 2006), for the proposition an "enterprise must have a continuity of an informal enterprise . . . ." Def.'s MTD at 25. However, a review of the *Johnson* case reveals Defendants have overstated this requirement. The *Johnson* court stated in pertinent part:

> The hallmark of an enterprise is structure . . . . [T]here must be *some structure*, to distinguish an enterprise from a mere conspiracy, but *there need not be much*. A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to *hierarchical or consensual decision-making*. The continuity of an informal enterprise and the differentiation among roles can provide the requisite structure to prove the element of enterprise.

440 F.3d at 840 (quoting *United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996)).

The Complaint alleges Tyson had on ongoing relationship with temporary employment services whereby the temporary agencies would supply Tyson with mostly illegal workers in

exchange for fees ranging from 1998 to 2001.  Specifically, Plaintiffs allege:  (1) Tyson paid each

agency a fee for each worker supplied by the companies; (2) Tyson maintained close relationships

with the agencies during the relevant time period, including significant contact and supervision by

Tyson; (3) some of the services opened offices inside Tyson's plants to facilitate the hiring process

but Tyson did not charge them rent; (4) Tyson acquiesced in the illegal hiring pursuant to the Willful

Blindness Policy; and (5) "Despite language to the contrary in the written contracts, which Tyson

used to distance itself from the illegal hiring, . . . Tyson [] paid each service a fee for its services in

procuring low-wage, mostly illegal immigrants."  Compl. at ¶43; *see also* Compl. at ¶¶39-42.

Despite Defendants' arguments to the contrary, these allegations provide the necessary continuity

and differentiation required to sufficiently plead the ongoing organizational structure for an

enterprise.  In *Mohawk Industries*, *Inc*., for example, the court found similar allegations to be

sufficiently pled.  *See* 465 F.3d at 1284 (concluding that an association of Mohawk Industries and

"third-party temp agencies/recruiters" supplying mostly illegal immigrants for a fee "sufficiently

alleged an enterprise under RICO").

### b.      The Hispanic Group Enterprise

Defendants also argue the Hispanic Group Enterprise fails as a matter of law for two reasons.

First, Defendants contend "there is nothing in the complaint that alleges that Tyson actually is

conducting the affairs of any distinct entity or enterprise."  Def.'s MTD at 26.  Second, Defendants

argue Plaintiffs have not alleged the Hispanic Group Enterprise formed an ongoing organization.

In order to be held responsible under RICO, a defendant must have participated in the

scheme and the operation or management of the enterprise itself.  *Reves v. Ernst & Young*, 507 U.S.

170, 185 (1993).  "Of course, the word 'participate' makes clear that RICO liability is not limited

to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprises' affairs is required." *Id.* at 179 (emphasis in original).

The Complaint alleges partnerships existed between Tyson and two major Hispanic Groups, League of United Latin American Citizens ("LULAC") and National Council of La Raza ("NCLR"). The Complaint further alleges Tyson formed long-term partnerships with both LULAC and NCLR whereby the groups requested Tyson to carry out the Willful Blindness Policy, and Tyson acceded to that request. Plaintiffs' reference to the Willful Blindness Policy incorporates into this section the description of the alleged policy, which was described in paragraphs 23-25 of the complaint. A look at a few examples of how Plaintiffs allege Tyson carried out the Willful Blindness Policy shows they have sufficiently alleged both Tyson's participation in the enterprise and an ongoing structural organization.

First, Plaintiffs allege pursuant to the Willful Blindness Policy: (1) Tyson signed Employment Eligibility Verification forms (I-9 forms) in mass quantities, before any documents were inspected, more than three days after new hires were employed, and after reviewing copies of the documents presented rather than viewing the original documents; (2) Tyson rehired people under different names, usually after they had taken a short absence and acquired new, stolen identities; (3) Tyson gave employees leave to "get good documents" after Tyson was informed the employees had been using someone else's identity, etc. According to the Complaint, the relationships between the two major Hispanic groups was formed in 2001 and has been in continuous existence since that time, resulting in an extremely close relationship between the organization and Tyson. Taking all of these

allegations as true, it appears at the direction of the LULAC and NCLR, Tyson carried out a Willful Blindness Policy, rather than smuggling, to ensure illegal aliens would be allowed to find employment.  The Court finds Plaintiffs' allegations are sufficient to survive Defendants' motion to dismiss.

### c. The Tyson Enterprise

Defendants move to dismiss the third enterprise alleged by Plaintiffs, the Tyson Enterprise, arguing "the law is clear Tyson Foods cannot be liable for conducting its own affairs through a pattern of racketeering."  Def.'s MTD at 27.  Defendants go on to argue this enterprise should be dismissed for the following reasons:  (1) Plaintiffs' allegation that the individual defendants furthered the conspiracy because of their willful blindness to hiring violation is insufficient because Plaintiffs have not pled a hiring violation that is a RICO predicate act and (2) Plaintiffs did not allege the requisite scienter for the individual defendants to be liable for conspiring to conduct the Tyson enterprise through a pattern of racketeering acts.

Defendants' first statement that Tyson cannot be liable for conducting its own affairs through a pattern of racketeering activity does not provide a ground for dismissing this enterprise.  The Court does not read the Complaint as alleging Tyson was conducting its own affairs.  Rather, the Complaint alleges the Tyson Enterprise is conducted by the individual defendants, who entered into a conspiracy to carry out the Illegal Immigrant Hiring Scheme.  Specifically, the Complaint states the following:

> Defendants John Tyson and Lee have approved the Willful Blindness Policy and keep it in place.  Defendants Percival, Kimbro, and Lee set compensation levels for hourly paid workers at the facilities which they know are too low to attract sufficient numbers of legal workers to staff the facilities.  Defendants John Tyson, Lee, and Kimbro approve of, and participate in, the association with the temporary employment services and the Hispanic Groups . . . . Defendant Schaffer oversees the

day-to-day relationships with the Hispanic groups and approves the payments to them. Defendant Wilt carries out the Willful Blindness Policy at her facility and rents housing to illegal immigrants. Defendant McCoy enforces the Willful Blindness Policy at several facilities, reviews I-9 forms which are improperly completed, and then takes no action, thereby ratifying the pattern and practice of I-9 subversion described above. He also recommended, to a meeting of 200 Tyson Human Resources managers, that they hire illegal workers to depress wages and labor costs.

Compl. at ¶46. From these allegations, it is clear Plaintiffs are alleging the individual defendants were conducting the affairs of Tyson in a way which violated RICO. These types of allegations certainly bring this enterprise within the realm of RICO. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (noting "an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any 'person' unlawfully to conduct an 'enterprise'. . .).

Since the Court has already held that Plaintiffs have sufficiently pled the predicate acts for a RICO violation, there is no need to address Defendants' arguments that Plaintiffs did not plead a hiring violation or that the individual defendants did not have the requisite mens rea.

IV.     **CONCLUSION**

For the reasons stated above, the Court will **DENY** Defendants' motion to dismiss (Court File No. 259).

An Order shall enter.

/s/_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**