UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| BIRDA TROLLINGER, VIRGINIA BRAVO, KELLY KESSINGER, IDOYNIA MCCOY, REGINA LEE, PATRICIA MIMS, LORI WINDHAM and ALEXANDER HOWLETT, individually and on behalf of all others similarly situated | ) ) ) ) ) ) ) | |
| | ) | No. 4:02-CV-23 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Chief Judge Curtis L. Collier |
| TYSON FOODS, INC., JOHN TYSON, ARCHIBALD SCHAFFER III, RICHARD, BOND, KENNETH KIMBRO, GREG LEE, KAREN PERCIVAL, AHRAZUE WILT and TIM MCCOY, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM

Before the Court are the motions *in limine* to exclude the expert testimony of Eric Posner

(Court File No. 411), George Borjas (Court File No. 412), and Michael Cutler (Court File No. 413)

by defendants Tyson Foods, Inc. *et al*. ("Defendants").  In ruling on Defendants' motions, the Court

has  considered responses from plaintiffs Birda Trollinger *et al*. ("Plaintiffs") (Court File Nos. 437,

436, 435, respectively), and the arguments and testimony at the *Daubert* hearing on November 7 and

8, and December 13, 2007 (Court File Nos. 465, 466, 469, 472, 473).  Before this Court is also

Defendant's motion to exclude supplemental materials submitted to correct George Borjas' analysis

(Court File No. 436), and the subsequent response and reply (Court File Nos. 438, 439).

For the following reasons, the Court will **GRANT** Defendants' motion to exclude the expert

opinion of Eric Posner (Court File No. 411); will **DENY** Defendants' motion to exclude the expert

testimony of Michael Cutler concerning English proficiency (Court File No. 413);[1] will **DENY** Defendants' motion to exclude George Borjas' supplemental material (Court File No. 436); will **GRANT IN PART** Defendants' motion to exclude George Borjas' testimony as it pertains specifically to the amount of damages suffered by Plaintiffs; and, will **DENY IN PART** Defendants' motion to exclude George Borjas' testimony as it pertains to the general effects of the employment of illegal immigrants on the wages of authorized employees, and to Tyson's market power (Court File No. 412).

I.      **FACTS**

This case has a lengthy history with this Court. A complete recitation of the allegations in this case is set out in the Court's Memorandum of May 29, 2007 accompanying its order denying Defendants' motion to dismiss (Court File No. 309).

In summary, Plaintiffs allege Defendants were willfully blind to the hiring of illegal immigrants, in violation of the Immigration Reform and Control Act ("IRCA") and the Immigration and Nationality Act, 8 U.S.C. § 1324(a) (Court File No. 115, pp. 5-9). Plaintiffs also allege Defendants knowingly hired illegal immigrants and harbored them, in violation of 8 U.S.C. § 1324(a)(3)(A), and utilized a criminal conspiracy in doing so, violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(1)(F) (Court File No. 115, pp. 9-15).

This litigation and the theories espoused by Plaintiffs are novel uses of RICO. Plaintiffs, citizens of the United States or otherwise authorized to work in the United States, allege Defendants

---

[1]The Court does not have occasion to address the full scope of Defendants' motion to exclude because Plaintiffs withdrew Michael Cutler's declaration, rendering the corresponding portions of Defendants' motion moot.

were involved in a scheme to knowingly hire illegal aliens to work at their facilities. According to

Plaintiffs, Defendants broke the law and assisted illegal aliens in breaking the law to increase their

profits. Allegedly, because Defendants hired and harbored illegal aliens, Defendants were able to

pay less than the going market wage, and thus decrease their costs. Plaintiffs, as legal employees

of Tyson, allege this depressed their wages. Plaintiffs indicate that no other case on this theory has

yet reached trial. Because of the novelty of this litigation, many of Plaintiffs' theories are untested

in law.

With the trial date now approaching, the parties have exchanged discovery and prospective

witness lists. Defendants challenged the admissibility of testimony from Plaintiffs' three experts,

Eric Posner ("Posner") (Court File No. 411), Michael Cutler ("Cutler") (Court File No. 413), and

George Borjas ("Borjas") (Court File No. 412). The parties agreed the admissibility of Eric Posner's

testimony could be decided solely upon the documents submitted to the Court (Court File No. 418).

A *Daubert* hearing was held to determine the admissibility of the testimony of Michael Cutler and

George Borjas on November 7 and 8, 2007, and December 13, 2007 (Court File Nos. 465, 466, 469).


II.     **STANDARD OF REVIEW**

In determining whether to allow expert testimony, a court must analyze the testimony under

a two-prong test. First, a court must determine whether the principles and methodology, as well as

the input or facts used by that methodology, are reliable. Federal Rule of Evidence ("Fed. R. Evid.")

702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993). Second, a court

must determine whether the expert testimony is relevant. Fed. R. Evid. 403; *Daubert*, 509 U.S. at

595. A trial court has substantial leeway in making these determinations. *Kumho Tire Co., LTD.*

*v. Carmichael*, 526 U.S. 137, 138, 141 (1999).

## A.    Reliability

The reliability of an expert's testimony is a question of whether the principles, methodology, and underlying factual bases are scientifically valid, i.e. conform to the principles of scientific inquiry, discussed below. *Daubert*, 509 U.S. at 595. Reliability is not based upon whether the conclusions drawn by the expert ultimately turn out to be correct. *Id.* at 595.

There are three components of any expert testimony a court must determine are sufficiently reliable to allow the testimony.[2] First, the principles and methodology must be reliable. Second, the input or facts used by the methodology to formulate a conclusion must be reliable. Third, the expert must have properly applied the methodology to the case's facts to arrive at a conclusion. *See id.* at 593-595. For example, a statistician's testimony would only be reliable if (1) the mathematical formulas and computer programs used to synthesize the data were reliable, (2) the data itself was collected in a reliable manner or taken from a reliable source, and (3) the data was analyzed by the computer programs in a reliable way, e.g. the computer technicians double-checked their work, and the statistician's conclusions were reliably based upon the results.

In making these determinations, case law has provided a non-exclusive list of factors to consider. Not every factor will be relevant in every situation, and courts are free to consider other factors relevant in determining the reliability of the expert testimony in any given case. *Id.* These non-exclusive factors are as follows:

1. The theory or method can be tested, potentially falsified, or refuted. *Id.* at 593.

---

[2] The Supreme Court has equated "reliable" with "scientifically valid," i.e. arrived at using the methods and procedures of science. *Id.* at 590.

2. The theory or method has been subjected to peer review and publication. New theories can still be admissible, but where there has been an opportunity for comment from the scientific community, flaws in the methodology are more likely to be exposed. *Id.*

3. A court should consider the known or potential error rate, and existence or maintenance of standards controlling the technique's operation. *Id.* at 594.

4. Methodology which has gained widespread acceptance in the relevant scientific community is likely to be more credible than methodology which is not generally accepted. *Id.*

5. A court should consider more carefully testimony based upon procedures or methodology which was developed expressly for the purposes of litigation. Testimony prepared expressly for litigation is more likely to contain bias than testimony which grows out of independent research. Fed. R. Evid. 702 advisory committee's note (2000); *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 430 (6th Cir. 2007). "If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on "scientifically valid principles." *Johnson*, 484 F.3d at 430, *citing Daubert v. Merrell Dow Pharm.* ("*Daubert II*"), 43 F.3d 1311, 1318 (9th Cir. 1995).

6. A court should consider whether the "analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue" is "too wide." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), *citing Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1360 (6th Cir. 1992), *cert. denied*, 506 U.S. 826 (1992). A court must consider whether the expert is justified in extrapolating from an accepted premise to an unfounded conclusion. Fed. R. Evid. 702 advisory committee's note (2000). Even where the methods are acceptable in the abstract, a court must determine whether they have been applied to the specifics of the case in an acceptable way.

7. The expert must adequately account for obvious alternative explanations. Fed. R. Evid. 702 advisory committee's note (2000); *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997); *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994). An expert need only consider the most obvious and potentially influential alternatives; he need not consider every potential minor or speculative cause. *Ambrosini v. Labarraque*, 101 F.3d 129, 140-41 (D.C. Cir. 1996).

8. The expert must conduct himself in the courtroom with the same level of intellectual rigor used by an expert in the relevant field outside of litigation. *Kumho*, 526 U.S. at 152; *see Sheehan*, 104 F.3d at 942.

9. The expert must be operating within a credible scientific or technical field, which is known to reach reliable results for the type of opinion the expert would give. *Kumho*, 526 U.S. at 151 (giving astrology and necromancy as examples for unreliable fields of "expertise"); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1208 (6th Cir. 1988)(pre-*Daubert*)(rejecting clinical ecology as a reliable science). Even where the field of expertise is credible, the expert's field of expertise may not be reliable for the question at issue.

10. "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005), *citing* Fed. R. Evid. 702 advisory committee's note (2000). A court cannot simply take the expert's word he is reliably basing his conclusions on experience. Fed. R. Evid. 702 advisory committee's note (2000); *Thomas*, 398 F.3d at 432; *United States v. Jones*, 107 F.3d 1147, 1160-61 (6th Cir. 1997). However, experience testimony can be permitted even

though the finder of fact may not believe everything in the testimony. *First Tennessee Bank Nat. Assoc. v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001).

11. When an expert changes the factual input or refines the methodology, thus altering the results of the test in favor of its patron, the test can be rendered unreliable. *See Nilavar v. Mercy Health System-Western Ohio*, 244 Fed. App'x 690, 697 (6th Cir. 2007).

12. A court can consider the expert's credentials and knowledge of the espoused field. However, an expert need not have total knowledge of a specific field to qualify, and a lack of knowledge of certain aspects of the field may comment on the credibility of the expert, rather than the admissibility of his testimony. *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 919-920 (6th Cir. 1984) (permitting an employment expert, with no knowledge of the legal requirements of the Age Discrimination in Employment Act, to testify whether there were factors, other than age, in the plaintiff's employment file to lead to dismissal).

### B. Relevancy

The expert testimony must also be relevant to the claim to be admissible. Fed. R. Evid. 702 requires the expert testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 403 requires the Court to exclude testimony where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See Daubert*, 509 U.S. at 595. In making this determination, a court considers the greater influence an expert's testimony may have over a jury, due to his credentials and authoritative demeanor, in comparison to a layperson, and evaluates possible unfair prejudice accordingly. *Daubert*, 509 U.S. at 595.

A court must also consider the rules barring hearsay, and only admit expert opinions based upon otherwise inadmissible hearsay if the facts or data qualifying as hearsay are "of a type reasonably relied upon by the experts in the particular fields in forming opinions or inferences upon the subject." Fed. R. Evid. 703; *Daubert*, 509 U.S. at 595.

## III.    DISCUSSION

As the Court understands the objections, there is no challenge to the qualifications of any of the three expert witnesses. Each expert appears to be extremely well-qualified and enjoys eminence among his peers. The objections instead focus on the reliability and relevance of the experts' expected testimony.

### A.    Testimony of Eric Posner

Deciding Defendants' objection to Eric Posner's testimony is simple. According to Plaintiffs, Posner's testimony will "help the jury understand why this case has been brought by private citizens, why the U.S. Government is unable to enforce all immigration violations, and that Congress has encouraged lawsuits such as this one" (Court File No. 437, p. 1). Plaintiffs argue Posner's legal testimony is necessary because a civil action under RICO is a specialized area of law, and jurors "will be confused, wondering why this case is being brought by private parties and not by the U.S. government . . ." (*id.*, p. 1; *accord* pp. 3-4).

Posner's testimony is not relevant because it will not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. His testimony is a thinly-veiled attempt to instruct the jury on matters of law. At a trial, there is only one expert in the law: the trial judge. It is the "sole function of the trial judge to instruct the jury." *United States v. Zipkin*, 729

F.2d 384, 387 (6th Cir. 1984). The Court will instruct the jury as to the relevant law, and is confident the jury will be capable of following the Court's instructions. *See id.* ("The judge (or the jury as instructed by the judge) can determine equally well the law.") (citation omitted).

Plaintiffs wish to have Posner testify "there has been a rapid increase in illegal immigration, the U.S. government's agencies are understaffed, and their enforcement of immigration law is lax and inadequate to address the problem" (Court File No. 437, p. 4). Such testimony would not assist the jury in understanding the evidence or making a factual determination. *See* Fed. R. Evid. 702. It is not relevant to the issues which will be presented at trial.

Finally, Plaintiffs are incorrect in asserting Posner's testimony, helping "the average juror [to] understand the role of and need for private enforcement of the immigration laws," functions similarly to the expert testimony in *Champion v. Outlook Nashville, Inc. Cf.* Court File No. 437, p. 5, *to* 380 F.3d 893, 908 (6th Cir. 2004). In *Champion*, an expert in police officer training procedures was permitted to testify as to the training police officers receive in determining the appropriate level of force to be used in given situations. 380 F.3d at 908. The factual issue before the jury was whether the amount of force used against the plaintiff was reasonable. *Id.* Thus, educating the jury on whether the officers at trial followed accepted police procedure was relevant to, although not dispositive of, whether the force they used was reasonable. *See id.* Here, Posner's prepared testimony is his opinion of the desirability of private enforcement. This is a policy judgment that will not be helpful to the jury.

For the foregoing reasons, this Court will **GRANT** Defendants' motion to exclude the testimony of Eric Posner (Court File No. 411).

**B.    Testimony of Michael Cutler**

### 1.    Scope

Prior to the *Daubert* hearing, Michael Cutler provided his expert report and declaration.  At the *Daubert* hearing, he also recounted the testimony he would give at trial.  The expert report includes Cutler's opinion, based on his thirty years of experience as an Immigration and Naturalization ("INS") agent, that an alien who has lived in the United States for several years will generally have a basic understanding of the English language (Court File No. 413, Exhibit 1, pp. 4, 7).  The report also includes a brief, general discussion of the use of false identification documents by illegal immigrants to secure employment in the United States (*id.*, pp. 3-4).  Cutler's declaration explains a methodology he has devised from his experience in the field which allows him to determine, based upon certain factors, whether a prospective employee is legally authorized to work in the United States by viewing the identification documents he or she presented (*id.*, Exhibit 2, ¶ 3).  Cutler then applies this methodology to records from 497 employees of Tyson Foods, Inc. ("Tyson") and determines 91 were or were likely to be illegal immigrants when hired (*id.*, ¶ 6).

Plaintiffs have withdrawn Cutler's declaration and his testimony discussing his declaration (Court File Nos. 435, p. 4; 465, p. 6; 455, p. 1; 473, p. 5; 467, p.8).  Cutler's remaining testimony pertains to the subject matter of his expert report, dealing with immigrants' proficiency in the English language (Court File No. 413, Exhibit 1).  Defendant's motion to exclude Cutler's testimony relating to his declaration is thus rendered moot (Court File No. 413), and the Court will consider only whether Cutler's testimony, relating to English-language proficiency, is admissible.

### 2.    Admissibility

Although the *Daubert* standard was created in the context of scientific testimony, the underlying considerations are applicable to testimony based on experience, rather than data

scrutinized according to the formal scientific method.  *See* Fed. R. Evid. 702 advisory committee's note (2000); *Thomas*, 398 F.3d at 432.  In considering whether Cutler can reliably testify as to his experiences concerning English proficiency, the Court must determine whether Cutler has sufficient experience in a relevant field, and whether that experience, when applied to these facts, is sufficient to support Cutler's conclusion.  *See Kumho*, 526 U.S. at 150; Fed. R. Evid. 702 advisory committee's note (2000); *Thomas*, 398 F.3d at 432; *Barreto*, 268 F.3d at 335; *Jones*, 107 F.3d at 1160-61.

The Court determines Cutler has sufficient experience in the field of immigration to formulate reliable opinions on the matter.  Cutler worked as an INS agent, in various capacities relating to immigration, from 1971 to 2002 (Court File No. 413, Exhibit 1, pp. 2-3).  He has testified numerous times in Congressional hearings concerning the enforcement and administration of immigration laws (*id.*, p. 3).  The Court finds such experience sufficient to allow Cutler to offer experience-based opinions on various aspects of hiring immigrants.  *See Kumho*, 526 U.S. at 153.

The Court also concludes Cutler adequately explained how his experience led to his conclusion that job applicants without a basic understanding of English are not likely to be authorized to work in the United States.  Fed. R. Evid. 702 advisory committee's note (2000); *Thomas*, 398 F.3d at 432; *Barreto*, 268 F.3d at 335; *Jones*, 107 F.3d at 1160-61.  Cutler explained, because illegal immigrants use fake documents to fabricate employment authorization, surrounding circumstances, most notably an inability to speak English, can be helpful in determining whether the documents are likely to be forgeries (*see* Court File No. 465, pp. 41, 44, 47).  Cutler's supervisors had instructed him on the use of English proficiency as a potential indicator of a lack of authorization to work in the United States (*id.* at pp. 38-40).  Cutler verified this notion in his

investigations and in his discussions with fellow agents (*id.* at p. 40).[3]  Although such informal

discussions between agents do not produce the same rigorous opportunity for falsification provided

by more formal scientific publication, testimony based on experience does not always fall into the

neatly-drawn parameters of scientific testimony.  *See Kumho*, 526 U.S. at 150.  Such informal

discussions with others in the immigration field provide some evidence of peer review, acceptance

in the field, and use of the standard outside of litigation.  Fed. R. Evid. 702 advisory committee's

note (2000); *Daubert*, 509 U.S. at 593, 594; *Johnson*, 484 F.3d at 430.

Defendants argue Cutler's limited testimony will not help a jury to understand the evidence,

because Cutler cannot testify as to how Tyson human resource employees were trained and what

questions they asked applicants (Court File No. 472, pp. 3-4).  However, Cutler's testimony need

not prove Plaintiffs' case, but only assist the jury in considering the evidence.  *See* Fed. R. Evid.

702.  A jury  is unlikely to have substantial experience in the field of immigration, and Cutler's

testimony explaining immigration documentation, fraudulent practices, and the likelihood of English

proficiency among some immigrants could be helpful to a jury (*e.g.*, Court File No. 465, pp. 30-44).

Such testimony provides context, background, and comparison for the jury to better comprehend

other evidence as it is presented.

This Court is satisfied, in light of Cutler's qualifications and experiences, he can reliably

---

[3]Defendants argue Cutler's testimony is inadmissible because it is based upon hearsay (Court File No. 472, p. 4).  Fed. R. Evid. 703 expressly permits an expert to rely on facts which may not be admissible into evidence where those facts are of the type reasonably relied upon by experts in that field.  Although Cutler's instruction from supervisors and discussions with fellow agents may constitute inadmissible hearsay if offered solely by Cutler, training and discussion of field experience is a type of information one would reasonably rely upon when working as an INS agent in the field of illegal immigration, and is an appropriate factual consideration particularly when in combination with Cutler's thirty years of personal experience in the field.

testify to the English proficiency opinions and related matters in his expert report. Accordingly, the Court will **DENY** Defendants' motion to exclude Cutler's testimony concerning English proficiency (Court File No. 413).

### C. Motion to Exclude Borjas' Supplement Material

The more difficult inquiry concerns the proposed testimony of Dr. George Borjas. Borjas is one of the, if not the, most preeminent scholars studying the effects of immigration on employment in the United States. According to both sides, there is very little scholarly work in this area. To the extent there is any, Borjas is the author of much of it.

Before considering the admissibility of Borjas' testimony, the Court must address Defendants' motion to exclude the updated version of exhibit 1 of Borjas' expert report (Court File No. 436). In light of the following discussion, the Court will **DENY** Defendants' motion to exclude the updated exhibit, and will consider both in its review of Borjas' expert report.

Borjas' original report had an exhibit consisting of a graph comparing Tyson's hourly wages to wages from related industries and occupations (Court File No. 412, Exhibit A). This exhibit will be referred to as "Exhibit 1 (original)." Defendants' economic expert, Dr. Henry S. Farber ("Farber")[4] criticized Exhibit 1 (original) because, while the chart included Tyson's straight hourly wage rate, the "hourly wage rate" for the related industries and occupations was calculated by taking people's yearly salaries and dividing by the number of hours they worked (*see* Court File No. 412, Exhibit E, p. 10). This is problematic because this calculation factors in overtime and monetary bonuses in the hourly wages for comparable industries and occupations, while Tyson's straight

---

[4]The Court understands Farber's testimony to be offered solely to undermine Borjas' expected testimony, and is not offered as an expert presenting his own, independent analysis of the data.

hourly wage does not (*id.*).

In response to this criticism, Borjas prepared an updated Exhibit 1 ("Exhibit 1 (updated)"), using straight hourly wage rates for the related industries and occupations (*see* Court File No. 436, Exhibit B, p. 97). Plaintiffs revealed Exhibit 1 (updated) to Defendants for the first time at Farber's deposition (*see id.*).

Defendants move the Court to exclude Exhibit 1 (updated) because they claim they were unfairly surprised by the document and were unable to address it (Court File No. 436, p. 3). This Court conducted a *Daubert* hearing for two days on November 7 and 8, and another day on December 13, 2007 (Court File Nos. 465, 466, 469). Defendants were aware of and had access to Exhibit 1 (updated) at Farber's deposition on May 29, 2007 (*see* Court File No. 436, Exhibit B). Defendants had ample time to consider and address the updated version of the exhibit. Although the Court does not condone the practice of surprising opposition by revealing new documents at a deposition or hearing, the Court has given *both* sides leeway in this regard.[5]

For the foregoing reasons, the Court will **DENY** Defendants' motion to exclude Exhibit 1 (updated) (Court File No. 436). Because Exhibit 1 (original) contains information distinct from

---

[5]Defendants unveiled a new exhibit at the *Daubert* hearing when examining its expert, Farber. *See* Farber's Testimony at the *Daubert* hearing on November 8, 2007, Court File No. 466, pp. 72-73, where the following exchange occurred:
> THE COURT: And the reason for not providing [this new exhibit] to the plaintiffs when it was prepared?
> MR. GREEN [Defendants]: Your Honor, I don't -- I can't articulate a precise reason why I failed to do that. It was-- If that was a deficient gesture on my part, I apologize. I did not think to send a copy in the mail to Mr. Foster. But he --
> THE COURT: Mr. Johnson, how much of a surprise is this?
> MR. JOHNSON [Plaintiffs]: Total.

Exhibit 1 (updated) yet still independently relevant to Borjas' report,[6] the Court will consider both exhibits in reviewing Borjas' report.

### D. Testimony of George Borjas

George Borjas was called to testify as to both causation and damages suffered as a result of Defendants' alleged violations (Court File No. 434). As follows, the Court will **GRANT IN PART** Defendants' motion to exclude George Borjas' testimony as it pertains specifically to the amount of damages suffered by Plaintiffs, and will **DENY IN PART** Defendants' motion to exclude Borjas' testimony as it pertains to the general effects of the employment of illegal immigrants on the wages of authorized employees, and to Tyson's market power.

#### 1. Damages

Borjas' damage calculations are based on estimates from Cutler's declaration of the number of unauthorized employees at Tyson (Court File No. 412, Exhibit A, pp. 3-4, 21, 24-28). Plaintiffs' have withdrawn Cutler's declaration (Court File Nos. 435, p. 4; 465, pp. 6, 75, 77; 455, pp. 1-2; 467, p. 8). Thus, Borjas' damage calculations are no longer based on evidence before the Court. Since Borjas' damage calculations no longer have a factual basis in this case (Court File No. 466, p. 65), they are neither reliable nor relevant. *See* Fed. R. Evid. 702. The Court will **GRANT IN PART** Defendants' motion to exclude George Borjas' testimony with regard to his damage calculations.

---

[6]Exhibit 1 (original) contains a calculated hourly wage based on statewide and Public Use Microdata Area ("PUMA") data (*see* Court File No. 412, Exhibit A). PUMA data is not statewide, but restricted to specific regions within the same state (Court File No. 412, Exhibit A, p. 9, n.8). Exhibit 1 (updated) addresses Farber's criticism of comparing straight hourly wages to Borjas' calculated hourly wage by using the straight hourly wages for both Tyson and the statewide averages (*see* Court File No. 466, p. 199). However, Borjas was unable to obtain PUMA straight hourly wages, so there is no PUMA data in Exhibit 1 (updated). Because PUMA data is region-specific within a state, rather than encompassing the entire state, the PUMA data is less likely to be, or less heavily, distorted by disparities in wages among more and less prosperous regions within the state.

### 2. General Causation

Although Borjas' damage calculations are not admissible, the methodology by which Borjas calculates these damages (Court File No. 412, Exhibit A, pp. 4-7, 14-28), in conjunction with his vast scholarship in economics dealing with immigration (*id.*, pp. 29-48), demonstrates Borjas' ability to testify *generally* concerning the effect of illegal immigration on the wages of authorized employees. The Court will **DENY IN PART** Defendants' motion to exclude George Borjas' testimony as it pertains to the general effects of the employment of illegal immigrants on the wages of authorized employees.

### 3. Tyson's Market Power

The Court must determine whether Borjas can testify to his opinion Tyson facilities have market power and are thus able to set wages below the going market wage in their local labor markets (*see* Court File No. 412, Exhibit A, pp. 7-14). In accordance with the discussion below, this Court will **DENY IN PART** Defendants' motion to exclude George Borjas' testimony concerning Tyson's market power.

#### a. Relevancy

Borjas' testimony asserting Tyson has market power is relevant (Court File No. 412, Exhibit A, p. 8). An average juror is unlikely to have considerable experience in economic analysis of the effects of illegal immigration on wages. Borjas' testimony discusses the wages Tyson pays in comparison to some other firms, and provides one explanation for why Tyson's wages appear below the comparable market rate (*see* Court File No. 412, Exhibit A, pp. 7-11; 436, Exhibit B, p. 97). As such, Borjas' testimony would "assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702.

### b.  Reliability

Borjas has utilized data from reliable sources to compare Tyson's wages with wages paid by firms for jobs and in geographic locations similar to Tyson's (Court File No. 412, Exhibit A, pp. 8-10).  Defendants have made numerous criticisms, through their expert, Farber, of Borjas' analysis and conclusion.  Ultimately, Borjas asserts the data he has presented does show Tyson has market power, whereas Farber asserts it does not.  This is the classic "battle of the experts," and it is up to the jury, not the Court, to weigh the credibility of each expert's opinion.  *See Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005).

Borjas' analysis is novelly applied, as he readily admits: "the existing academic literature has not generally examined the impact of immigration-induced labor supply shifts on the wage level of a specific firm" (Court File No. 412, Exhibit A, p. 7).  However, Borjas analysis is based upon the application of his vast scholarship in the field and basic, universally-accepted economic principles to data collected from reliable sources.  To the extent Defendants, through Farber, argue Borjas' application of these principles at the firm level undermine the accuracy or credibility of his conclusion, it is the role of the jury to make that factual determination.  *See Phillips*, 400 F.3d at 399.

Defendants argue the data Borjas has used in his analysis is not adequately comparable to the nature of the jobs at the Tyson facilities and the specific geographic locations from which the Tyson facilities draw their workers (Court File No. 472, pp. 9-10).  A jury may agree that the limitations of the data render Borjas' conclusions unconvincing.  At the *Daubert* stage, Borjas has collected the most relevant wage data available and, informed by his expertise in immigration and economics, has drawn conclusions as to how that data should be interpreted.  *See Joiner*, 522 U.S.

at 146. Defendants' opportunity to argue how and to what extent Borjas' analysis and conclusions are incorrect is provided through cross-examination and the presentation of their own expert and evidence at trial. *See Phillips*, 400 F.3d at 399.

This Court is the gatekeeper to assure its trials are not flooded with "junk science," i.e. expert testimony that equates to little more than unreliably-based, advocacy-propelled conclusions. *See Kumho*, 526 U.S. at 137 (*citing Daubert*, 509 U.S. at 589). Here, a foremost expert in the field of economics and immigration analyzed data and determined that data, although not perfect in its specificity, was sufficient to make certain, reasoned conclusions as to Tyson's market power. Beyond that, the Court has no place in making factual determinations as to which expert's opinion is more credible; the jury is entrusted with that task. *See Phillips*, 400 F.3d at 399.

## IV.    CONCLUSION

In accordance with the foregoing analysis, this Court will **GRANT** Defendants' motion to exclude the expert opinion of Eric Posner (Court File No. 411); will **DENY** Defendants' motion to exclude the expert testimony of Michael Cutler concerning English proficiency (Court File No. 413); will **DENY** Defendants' motion to exclude George Borjas' supplemental material (Court File No. 436); will **GRANT IN PART** Defendants' motion to exclude George Borjas' testimony as it pertains specifically to the amount of damages suffered by Plaintiffs; and, will **DENY IN PART** Defendants' motion to exclude George Borjas' testimony as it pertains to the general effects of the employment of illegal immigrants on the wages of authorized employees, and to Tyson's market power (Court File No. 412).

An order shall enter.

/s/
_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**