| | | |
|---|---|---|
| BIRDA TROLLINGER, VIRGINIA | ) | |
| BRAVO, KELLY KESSINGER, | ) | |
| IDOYNIA MCCOY, REGINA LEE, | ) | |
| PATRICIA MIMS, LORI WINDHAM | ) | |
| and ALEXANDER HOWLETT, | ) | |
| individually and on behalf of all others | ) | |
| similarly situated | ) | No. 4:02-CV-23 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Chief Judge Curtis L. Collier |
| | ) | |
| TYSON FOODS, INC., JOHN TYSON, | ) | |
| ARCHIBALD SCHAFFER III, RICHARD, | ) | |
| BOND, KENNETH KIMBRO, GREG | ) | |
| LEE, KAREN PERCIVAL, AHRAZUE | ) | |
| WILT and TIM MCCOY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

In this lengthy, vigorously contested civil case, defendants Tyson Foods, Inc. et al. ("Defendants") have moved for summary judgment (Court File No. 449).[1] After considering the filings of the parties and the applicable law, for the following reasons the Court will **GRANT** Defendant's motion.

## I.    FACTS

This case has a long history with this Court. It was initially filed on April 2, 2002. (Complaint, Court File No. 1). The case was dismissed for failure to state a claim on July 16, 2002

---

[1]The following motions are also pending: Court File Nos. 316, 347, 449, 488, 491, 495, 496, 502-8, 510-20, 522.

(Court File No. 22). Upon appeal, this dismissal was reversed by the United States Court of Appeals for the Sixth Circuit and the case was remanded to this Court (Court File Nos. 25, 26). *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602 (6th Cir. 2004). This Court denied Defendants' Motion for Judgment on the Pleadings (Court File Nos. 162, 174 ) on September 18, 2006. On October 10, 2006, the Court granted the Motion to Certify Class of plaintiffs Birda Trollinger et al. ("Plaintiffs") (Court File Nos. 121, 183). On May 29, 2007 the Court denied Defendants' second Motion to Dismiss (Court File Nos. 259, 310)

Plaintiffs bring this action under the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964. Plaintiffs are a class of current and former employees at several chicken processing plants of Tyson Foods, Inc. ("Tyson") who are authorized to work in the United States (Court File No. 460, Appendix A). Plaintiffs allege Defendants were members of a conspiracy to knowingly bring illegal immigrants into the United States and employ them in violation of 8 U.S.C. § 1324(a)(3)(A). This alleged conspiracy involved prolonged efforts to harbor and conceal these illegal immigrants from detection by the proper authorities, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). Plaintiffs allege, by hiring and harboring illegal immigrants, Defendants were thus able to pay less than the going market wage to their employees. As a result, Plaintiffs, as legally-authorized employees, were paid less than they should have been as a result of Defendants' use of illegal alien labor. Plaintiffs seek to recover damages in the amount of triple the difference between their artificially-depressed wages and the competitive market wages Plaintiffs should have been paid, as provided by 18 U.S.C. § 1964(c) (Court File No. 115, p. 16).

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party must demonstrate no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).  That is, the moving party must provide the grounds upon which it seeks summary judgment, but does not need to provide affidavits or other materials to negate the non-moving party's claims.  *Celotex*, 477 U.S. at 323.  The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  However, the non-movant is not entitled to a trial based solely on its allegations, and must submit significant probative evidence to support its claims.  *Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof.  *Celotex*, 477 U.S. at 323.  In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

### III.    APPLICATION

### A.    Applicable Law

Plaintiffs bring their claims under RICO.  RICO itself does not contain specific substantive offenses, but rather adopts substantive offenses from other statutes as predicate offenses.  Thus, Plaintiffs must satisfy all the elements under RICO, which deals with the organizational structure by and manner in which the predicate offenses were violated, as well as the elements required by the predicate offenses.  Here, Plaintiffs have alleged violations of 18 U.S.C. § 1962(c), for conducting or managing a RICO enterprise, and 18 U.S.C. § 1962(d), for conspiring to commit a 1962(c) offense.  These RICO offenses are predicated upon immigration violations, 8 U.S.C. § 1324(a)(1)(A)(iii), (a)(3)(A).

### 1.    RICO Offenses

To prove a violation of 18 U.S.C. § 1962(c), Plaintiffs must show Defendants (1) conducted or participated in (2) the activities of an enterprise (3) through a pattern (4) of racketeering activity. *See, e.g., Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993).  To prove a violation of 18 U.S.C. § 1962(d), Plaintiffs must show (1) a conspiracy (2) with the purpose of violating 18 U.S.C. § 1962(c). *See, e.g., Beck v. Prupis*, 529 U.S. 494, 506 (2000).  As a civil RICO action, Plaintiffs also need to prove (1) a requisite injury to "business or property," and (2) that the injury was "by reason of" the predicate RICO violation.  18 U.S.C. § 1964 (c); *see, e.g., id.* at 505-06.

### 2.    Predicate Immigration Offenses

To support their RICO claims, Plaintiffs have alleged Defendants committed two types of predicate offenses.  First, Plaintiffs allege Defendants, during a twelve-month period, knowingly hired at least ten individuals with actual knowledge those individuals were unauthorized to work in

the United States and were brought into the country for purposes of illegal employment.  8 U.S.C.

§ 1324(a)(3)(A).[2]  Second, Plaintiffs allege Defendants knowingly, or with reckless disregard of the

---

[2]This statement of the law warrants some discussion, because the "actual knowledge" requirement, 8 U.S.C. § 1324(a)(3)(A), is self-referential, and thus has been identified as "difficult to interpret."  *See Hernandez v. Balakian*, 480 F. Supp. 2d 1198, 1204 (E.D. Cal. 2007); *accord Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 309 (D.N.J. 2005); *accord System Management, Inc. v. Loiselle*, 91 F. Supp. 2d 401, 408 (D. Mass. 2000).  The relevant statutory provisions are as follows:

8 U.S.C. § 1324(a)(3)(A): "Any person who, during any 12-month period, knowingly hires for employment at least 10 individuals with actual knowledge that the individuals are aliens described in subparagraph (B) shall be fined under Title 18 or imprisoned for not more than 5 years, or both."

8 U.S.C. § 1324(a)(3)(B): "An alien described in this subparagraph is an alien who--
(i) is an unauthorized alien (as defined in section 1324a(h)(3) of this title), and
(ii) has been brought into the United States in violation of this subsection."

8 U.S.C. § 1324a(h)(3): "Definition of unauthorized alien
As used in this section, the term "unauthorized alien" means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General."

Thus, § 1324(a)(3)(A) requires a showing of "actual knowledge that the individuals are aliens," and refers to § 1324(a)(3)(B) to define "aliens."  The definition in § 1324(a)(3)(B) is two-fold.  First, an "alien" is an "unauthorized alien" which, as defined in § 1324a(h)(3), is an alien not lawfully admitted for permanent residence or to be employed as such.  Second, the "alien" must have been brought into the United States in violation of § 1324(a)(3)(A), thus referring back to the original subsection.

This Court, joining the other district courts which have addressed this issue, interprets § 1324(a)(3)(A) to require a plaintiff to show the defendant knew the individual was unauthorized to work in the United States and knew the individual was brought into the United States illegally for the purposes of illegal employment.  *See Hernandez*, 480 F. Supp. 2d at 1204; *Zavala*, 393 F. Supp. 2d at 309; *Loiselle*, 91 F. Supp. 2d at 408.  Requiring knowledge, not only that the individual is unauthorized, but that he or she was brought in illegally, conforms with the clear language of § 1324(a)(3)(B), which requires the "alien" be "brought into the United States," and conforms with the purpose of the statute, which provides penalties for "bringing in and harboring certain aliens." *See* 8 U.S.C. § 1324.

Furthermore, RICO expressly includes offenses under 8 U.S.C. § 1324 as predicate offenses, but

fact, harbored or concealed illegal aliens. 8 U.S.C. § 1324(a)(1)(A)(iii).

**B.    Defendants' Motion for Summary Judgment**

Defendants make six arguments to support their motion for summary judgment:

(1) there is no evidence of illegal hiring;

(2) there is no evidence of damages;

(3) there is no evidence the damages were proximately caused by the RICO violations;

(4) there is no evidence Defendants' had "actual knowledge" pursuant to 8 U.S.C. § 1324(a)(3)(A);

(5) there is no evidence of damages or a pattern of harboring for the 8 U.S.C. § 1324(a)(1)(A)(iii) offense; and,

(6) there is no evidence of a racketeering enterprise (Court File No. 450).

As previously stated, Plaintiffs must provide sufficient evidence to support their claims on each material element of both the predicate offenses and the RICO claims. Thus, each of Defendants' arguments, if shown to be correct, independently warrants summary judgment. The Court considers these arguments in turn.

**1.    Evidence of Illegal Hiring with Requisite Knowledge**

Plaintiffs must provide evidence, during a twelve-month period, Defendants knowingly hired at least ten individuals with actual knowledge those individuals were unauthorized to work in the United States and were brought into the country for purposes of illegal employment. *See* 8 U.S.C.

---

does not include those under 8 U.S.C. § 1324a. *See* 18 U.S.C. § 1961(1)(F); *accord Hernandez*, 480 F. Supp. 2d at 1204; *Zavala*, 393 F. Supp. 2d at 309; *Loiselle*, 91 F. Supp. 2d at 408. If the Court were to only require Plaintiffs to prove knowledge that the individual was not authorized to work in the United States, 8 U.S.C. § 1324 would duplicate the scope of 8 U.S.C. § 1324a ("Unlawful employment of aliens"), and thus open a backdoor to RICO for § 1324a-type claims.

§ 1324(a)(3)(A).

To carry their burden of proof under this offense, one would expect Plaintiffs to first present evidence of the illegal status of the workers. This could be established, among other ways, by the testimony of the illegal aliens themselves, their co-workers, their associates, those who secured employment for them at the Tyson facilities, or their supervisors or managers. It could also be established by admissible government records, such as records of deportations or other official action establishing the employees in question were illegal aliens.

Once sufficient employees were shown to be illegal aliens, Plaintiffs would then have to show Defendants hired the illegal aliens knowingly. To establish this, one would expect Plaintiffs to present either testimonial or documentary evidence of Defendants' knowledge that at the time these illegal aliens were hired, Defendants knew they were illegal aliens.

Plaintiffs have chosen not to present evidence one would typically expect. Rather, Plaintiffs have selected a non-traditional approach. Unfortunately for Plaintiffs, their chosen path falls short of the evidence required by 8 U.S.C. § 1324(a)(3)(A).

In an effort to present sufficient evidence concerning the presence of illegal aliens and Defendants' alleged knowledge of their presence, Plaintiffs offer only (a) class counsel's unfounded determination some employees are illegal aliens, (b) an excerpt from the transcript of the testimony of a witness at a previous criminal trial, and (c) various Tyson written personnel communications (Court File No. 467, pp. 5-8).[3]

_____

[3]Plaintiffs previously argued two additional sources of evidence. First, they offered the declaration of Michael Cutler, a former Immigration and Naturalization Service ("INS") agent. However, Plaintiffs withdrew the declaration of Michael Cutler, which stated 91 out of the 497 employee records he reviewed appeared to belong to unauthorized workers (Court File No. 467, p. 8). Second, Plaintiffs intended to offer certain immigration files from the Department of Homeland

### a.      Class Counsel's Analysis

Class counsel seeks to introduce their own conclusion that 91 of 497 sampled Tyson employees are not authorized to work in the United States (Court File No. 467, p. 5).  This evidence is insufficient to avoid summary judgment because class counsel's conclusions are not probative evidence which would support Plaintiffs' claim, but rather mere allegation without factual basis.[4] Class counsel's reasoning is as follows: Michael Cutler concluded in his expert report that an alien who has lived in the United States for several years will generally have a basic understanding of the English language (Court File No. 413, Exhibit 1, pp. 4, 7).  Extrapolating from Mr. Cutler's testimony, Plaintiffs conclude every one of the 497 applicants who did not complete their application in English, where that applicant claimed to be a "U.S. citizen" or "Lawful Permanent Resident Alien," "should be suspected of using false or fraudulent documents" (Court File No. 467, p. 5). Further extrapolating, Plaintiffs then conclude all these 91 applicants who are suspected of using

security ("DHS"), but failed to secure those files.  Plaintiffs served a subpoena on the DHS to obtain the immigration files of the 91 individuals Mr. Cutler identified as potentially illegal in his withdrawn declaration (Court File No. 482, p. 1).  When the DHS did not comply, Plaintiffs filed a motion to enforce the subpoena in the District Court of the District of Columbia, which was denied.  *Trollinger et al. v. Tyson Foods, Inc.*, No. 1:07-MC-341, Docket Entry on 1/11/2008 (D.D.C.).  Plaintiffs moved to continue the trial date until that ruling could be decided on appeal (Court File No. 482).  This Court denied the motion for continuance, because Plaintiffs failed to show good cause why they had waited to request the documents until September 24, 2007 (*see* Court File No. 493).

[4]Before class counsel sought to provide its own conclusions as to the legality of certain Tyson employees, Plaintiffs felt this matter required an expert.  Plaintiffs planned to have an immigration expert, Mr. Cutler, testify as to the legality of certain Tyson employees based upon their employee records (Court File No. 413, Exhibit 2).  The two major differences between class counsel's conclusions here and those formerly asserted by Mr. Cutler, are (1) Mr. Cutler has expert experience in the field of illegal immigration, and (2) in arriving at his conclusions, Mr. Cutler relied on more factors than just whether the applicant completed the employment application in English (*id.*).  On their own accord, Plaintiffs withdrew Mr. Cutler's declaration, which contained his conclusions (Court File No. 467, p. 8).

false or fraudulent documents are illegal immigrants (*id.*).

Class counsel's conclusion lacks factual support. First, Mr. Cutler's testimony only states aliens who have been in the United States for several years generally have an understanding of English; it does not support the conclusion that all applicants who do not have sufficient English proficiency to, or choose not to, fill out the employment application forms in English are illegal (Court File No. 413, Exhibit 1, pp. 4, 7). Second, even granting Plaintiffs' assumption that all non-English applications raise valid suspicion of the applicants being unauthorized, that does not lead to class counsel's conclusion that all of the suspicious applicants are illegal (Court File No. 467, p. 5). Class counsel's unfounded conclusions provide no factual support for Plaintiffs' burden to show employees at Tyson were illegal aliens.[5]

### b. Mr. Copeland's Trial Testimony and Tyson Personnel Communications

In an attempt to prove Tyson had at least ten illegal immigrants working at each of its plants, and had actual knowledge those employees were unauthorized to work in the United States and were brought into the country for purposes of illegal employment, Plaintiffs have cited the testimony of Mr. Copeland, Tysons' ethicist,[6] and several letters and e-mails sent to or circulated among Tyson's human resource employees (Court File No. 467, p. 7).[7] In considering whether Plaintiffs' evidence

---

[5]Furthermore, class counsel's conclusions fail to address the "actual knowledge" requirements, which are material elements of 8 U.S.C. § 1324(a)(3)(A).

[6]Plaintiffs do not clearly identify "Mr. Copeland." The Court assumes from context it is Dr. John Copeland, Tyson's former executive vice president of ethics, food safety and environmental compliance.

[7]Plaintiffs argue "Tyson is not entitled to summary judgment based on speculation that particular workers are actually legal" (Court File No. 467, p. 6). In fact, Plaintiffs have the burden to put forth sufficient evidence to satisfy the essential elements of their claim, not Defendants to disprove them. *See Celotex*, 477 U.S. at 323. Plaintiffs are not entitled to a trial based upon mere

is sufficient to withstand summary judgment, the Court considers (1) whether the evidence is sufficient to establish Plaintiffs' burden of proof, *see Celotex*, 477 U.S. at 322, and (2) whether the evidence is admissible. Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.") In presenting evidence to avoid summary judgment, Plaintiffs cannot rely on hearsay in affidavits or testimony, unless Plaintiffs show such hearsay to be admissible under an exception to the hearsay rule. *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (*citing U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997)) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence. . .must be disregarded.")

### i. Mr. Copeland's Trial Testimony

Plaintiffs allege "Tyson's own ethicist conducted an investigation of thousands of workers Tyson investigated for using fake documents to obtain employment. He concluded *that none of them were legal*" (Court File No. 467, p. 7) (emphasis in original). To support this allegation, Plaintiffs cite an excerpt of Mr. Copeland's trial testimony which does *not* support that allegation (*id.*, Exhibit B, p. 3093). In the excerpt, Mr. Copeland testifies that another person told him of an unidentified e-mail which claimed some Tyson employees were using the same identification numbers as some people in Texas (*id.*, p. 3092). That person told Mr. Copeland this meant either the Tyson employees were using the identification numbers of the Texans, or the Texans were using the identification numbers of the Tyson employees (*id.*, p. 3093). Then, in response to the question "from that e-mail that you have observed in the court here and your own knowledge, are you aware

_____

speculation that particular workers are illegal. *See id.* at 324.

of a single instance when the Tyson team member was the real person," Mr. Copeland answered "I am not no" (*id.*). Plaintiffs provide no explanation how, from this exchange, Plaintiffs draw the conclusion Mr. Copeland investigated and identified thousands of illegal employees (*see id.*, p. 7). If Plaintiffs have the evidence to support such a statement, they have not provided it to this Court.

At the summary judgment stage, Plaintiffs must "submit significant probative evidence to support" the essential elements of their claims. *See Celotex*, 477 U.S. at 324; *McLean*, 224 F.3d at 800. The Court cannot merely assume Plaintiffs have evidence; Plaintiffs must produce it. *See id.* The Court can only evaluate the sufficiency of the evidence put before it. In evaluating the contents of the excerpt from Mr. Copeland's testimony,[8] this Court finds no evidence which meets the factual and legal requirements of 8 U.S.C. § 1324(a)(3)(A) and the applicable federal rules.

First, Plaintiffs must offer *admissible* evidence to satisfy their burden in opposing a motion for summary judgment. *See U.S. Structures*, 130 F.3d at 1189. In the cited portion of Mr. Copeland's testimony, Mr. Copeland affirms he is not "aware of a single instance when the Tyson team member was the real person" based upon an unidentified e-mail he observed in court and his own knowledge (Court File No. 467, Exhibit B, p. 3093). As a threshold matter for admissibility, Mr. Copeland must have "personal knowledge" of the matter to which he is testifying. Federal Rule of Evidence ("Fed. R. Evid.") 602; Fed. R. Civ. P. 56(e)(1). The excerpt of the testimony provides no indication of the basis of Mr. Copeland's knowledge, and Plaintiffs provide none.

This is particularly problematic because the remainder of Mr. Copeland's excerpted

---

[8] The Court reviewed the entire exhibit B, despite Plaintiffs having only cited a smaller portion of it. The remainder of the provided testimony does not cure the evidentiary defects described in the following analysis, nor does it provide any additional evidence which would not be rendered inadmissible or irrelevant.

testimony indicates Mr. Copeland's knowledge is based entirely or largely upon what he was told by other people (*see* Court File No. 467, Exhibit B, pp. 2957-58, 3092, 3094, 3095). This appears to be hearsay, which is generally not admissible evidence. *See* Fed. R. Civ. P. 56(e)(1). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). To render admissible Mr. Copeland's testimony concerning what other people told him and any "knowledge" he had based upon the statements of others, Plaintiffs need to present evidence as to why that testimony would be admissible - likely either by arguing the statements are not hearsay because they were admissions by a party-opponent, under Fed. R. Evid. 801(d)(2), or are otherwise an exception to the hearsay rule, under Fed. R. Evid. 803, 804. Plaintiffs have made no attempt to do so.[9]

Even if Mr. Copeland's testimony were admissible and provided proof of the presence of unauthorized employees at one or more Tyson facilities, Plaintiffs' burden requires proof that Defendants knowingly hired at least ten individuals with actual knowledge those individuals were unauthorized to work in the United States and were brought into the country for purposes of illegal employment. *See* 8 U.S.C. § 1324(a)(3)(A). Plaintiffs' cited excerpt does not establish Defendants had knowledge the individuals were illegal when they were hired, or had knowledge that they were brought into this country for the purposes of illegal employment.

---

[9]This Court has no basis upon which to view these statements as anything other than inadmissible hearsay. Fed. R. Evid. 801(d)(2)(D) permits statements offered against a party when the statement was made "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." To the extent some of these statements might constitute such an admission, Plaintiffs have not identified who these speakers were or established whether any of the speakers in Mr. Copeland's testimony were authorized to make statements on behalf of any of the Defendants. Without more, Plaintiffs' asserted evidence is inadmissible as hearsay.

Even assuming such knowledge could be inferred, Mr. Copeland's generalizations do not establish the requirement under 8 U.S.C. § 1324(a)(3)(A) of "at least 10" illegal immigrants. In drafting 8 U.S.C. § 1324(a)(3)(A), Congress expressly required a showing of "at least 10 individuals" who were unauthorized to work in the United States. In other subsections of the statute, a defendant is guilty for a violation involving only one illegal immigrant. *See* 8 U.S.C. §§ 1324(a)(1)(A)(i-iv), (a)(2). Congress could have drafted 8 U.S.C. § 1324(a)(3)(A) to only require a showing of one illegal immigrant; instead, the statute requires involvement of at least 10 illegal immigrants. Although the Court does not read the statute to require a witness expressly to testify that there were at least ten illegal immigrants, the testimony must make it clear there were at least ten. Because Mr. Copeland's statement does not provide a basis from which to infer how many illegal immigrants were employed at which Tyson facilities during what time periods, a reasonable jury would have no basis to infer from Mr. Copeland's testimony the presence of at least ten unauthorized employees (*see* Court File No. 467, Exhibit B, p. 3093).

In conclusion, Plaintiffs have failed to establish what personal knowledge Mr. Copeland had. Furthermore, Mr. Copeland's statement does not allege Defendants had the actual knowledge required under 8 U.S.C. § 1324(a)(3)(A). Also, without more, Mr. Copeland's statement is too general to prove Tyson had at least ten illegal immigrants working at any given Tyson facility. Mr. Copeland's testimony provides no evidentiary grounds upon which Plaintiffs can satisfy their burden of proof under 8 U.S.C. § 1324(a)(3)(A) to avoid summary judgment.

### ii.     Tyson Personnel Communications

Plaintiffs have also provided various e-mails and letters sent to or distributed among Tyson human resource personnel relating to their investigation of employees (Court File No. 467, p. 7).

These communications detail situations where employees were accused or suspected of securing their employment with false identification papers or information (Court File No. 467, Exhibit H).

The first situation involved a Gerardo Pimentel in 2004. The wife of a non-Tyson employee called and informed Tyson her husband was the real Gerardo. The Gerardo working at Tyson was called in and questioned. He admitted to having "bad papers" and quit. Two people accompanying him also quit for other reasons, although the Tyson investigator suspected they might be quitting for fear they too would be investigated (*id.*, discovery numbers TYS065803-4).

The second situation involved Jesse Alvarez and Jesusita Garza in 2001, where a healthcare provider processed claims for individuals by those names in Texas, while they were also listed as Tyson team members in Sedalia, Missouri. Jesse admitted his or her documents were false, and was terminated. Jesusita asserted her documents were valid, and Tyson requested she resolve the matter with the social security office. She did not return to work again (*id.*, discovery numbers TYS007534, 064664).

The third situation involved a Gilberto Olvarez, Jr. in 2001. This man was listed on a health plan through the Tyson Shelbyville, Tennessee plant and through a Perdue health plan in Monterey, Tennessee, 120 miles away. The evidence does not state the results of the investigation (*id.*, discovery number TYS007530).

The fourth situation involved twenty-five employees at the Tyson plant in Cumming, Georgia in 2001. Texas healthcare providers processed claims for these twenty-five people while twenty-five Tyson workers with the same names and social security numbers were at work in Cumming, Georgia. The e-mail states the Texas healthcare providers sent documents proving their patients were the "real" people to whom the identities belonged, but the e-mails do not specify

whether that was shown to be the case or what became of the twenty-five employees (*id.*, discovery number TF12 088294-5).

The fifth situation involved a Wilfredo Munera-Torres in 2004. The Plaintiffs provide a letter Wilfredo sent to Tyson, informing Tyson someone was using his social security number, because the Internal Revenue Service ("IRS") accused him of not reporting earnings from Tyson, where he had not been working. There is no information on how the matter was resolved (*id.*, discovery number TYS066631)

The sixth situation involved a Marianella Enriquez during 1997 and 1998, at the Springdale, Arizona facility. The IRS wrote a letter to Tyson, informing them Marianella had contacted them concerning the appearance of Tyson wages on her tax records which she claimed she had not earned. These wages were actually from Maria Nela Nino, who appears to have been using the same social security number as Marianella. The IRS asked Tyson for information on how to proceed, because its "employment documentation appears to be valid." There is no further information on how the matter was resolved (*id.*, discovery number TF12 114943).

The seventh situation involved a Alyan Sandoz Maldonado in 2003. He admitted his real name was Jose Domingo Juan, and that his documentation had been false (*id.*, discovery number TYS065273).

The eighth situation involved a George Luuie Aguirre, Jr. in 2001. Tyson received a report he was on the healthcare policy of another company. He admitted to using his brother's papers, and was terminated (*id.*, discovery numbers TYS064667-8).

The ninth situation involved Marie Bartolomei, Antonio Parrilla, and Nilda Martinez. Marie and Nilda admitted to using false documents, and Antonio denied it. The e-mail implied the former

two should be terminated. The latter was provided an opportunity to bring his documents in to prove his claim. There is no further information on how the matter was resolved (*id.*, discovery number TYS065288).

The tenth situation involved a Mr. Casas in 2004 at the Sedalia, Missouri plant. A healthcare identity issue arose. Mr. Casas admitted to using a false social security card and was terminated (*id.*, discovery number TYS022969).

The eleventh situation involved an Edgardo Sanchez in 2004. A man called in to report Edgardo was using fake papers. When questioned, Edgardo admitted the papers he submitted were fake, but claimed his real papers had been sent away for renewal. He was suspended for three days, and the drafter of the e-mail was asking for permission to terminate him (*id.*, discovery number TYS065826).

These e-mails and letters suffer from the same deficiencies as Mr. Copeland's testimony. The majority of the e-mails are statements made by one person concerning what another person said. Again, Plaintiffs have failed to provide any basis or argument for why these statements are not inadmissible hearsay. Even assuming the evidence is admissible, Plaintiffs must prove at least ten illegal aliens were employed at any given plant. Only one of these cited documents deals with at least ten individuals (*id.*, discovery number TF12 088294). That e-mail refers to twenty-five employees at the Tyson plant in Cumming, Georgia in 2001 who were at work while health care claims were processed under the same names and social security numbers in Texas (*id.*). There is no indication whether the Tyson employees or individuals in Texas were the legitimately-named people; whether, if the Tyson employees were illegal aliens, whether they were fired or retained; whether, if illegal aliens, Tyson had actual knowledge the individuals were unauthorized to work

in the United States when they were hired or retained; or whether, if illegal aliens, Tyson had actual knowledge the individuals were brought into the United States for the purposes of illegal employment when they were hired or retained. *See* 8 U.S.C. § 1324(a)(3)(A). Plaintiffs' cited correspondence does not satisfy their burden of proof on summary judgment.

### c. Evidence Aliens Were Brought into the United States

As previously stated, Plaintiffs must provide sufficient evidence to support the predicate offense, i.e. during a twelve-month period, Defendants knowingly hired at least ten individuals with actual knowledge those individuals were unauthorized to work in the United States and were brought into the country for purposes of illegal employment. 8 U.S.C. § 1324(a)(3)(A); *Hernandez*, 480 F. Supp. 2d at 1204; *Zavala*, 393 F. Supp. 2d at 309; *Loiselle*, 91 F. Supp. 2d at 408. Thus, as an independent, material element of the predicate offense, Plaintiffs must provide evidence Defendants had actual knowledge these individuals were "brought" into the United States illegally for the purposes of illegal employment. *Id.* Plaintiffs have made no effort to demonstrate such knowledge. Neither the testimony of Mr. Cutler, the excerpts of Mr. Copeland, nor the documentary evidence even allude to this requirement.

### d. Conclusion

To establish a RICO claim predicated on 8 U.S.C. § 1324(a)(3)(A), Plaintiffs must provide sufficient probative evidence of the material elements of that predicate offense. As such, Plaintiffs must provide sufficient evidence to show Tyson had at least ten illegal aliens employed at each of its facilities, and that Defendants had actual knowledge each facility employed at least ten individuals who were unauthorized to work in the United States and were brought into the country

for purposes of illegal employment.[10]  *See* 8 U.S.C. § 1324(a)(3)(A).  Plaintiffs have failed to do so.[11]

As a result, the Court will **GRANT** Defendants' motion for summary judgment on Plaintiffs' RICO

claims predicated on 8 U.S.C. § 1324(a)(3)(A) (Court File No. 449).

### 2.    Evidence of Harboring and Concealing

Plaintiffs also assert as a RICO predicate offense that Defendants have violated 8 U.S.C. §

1324(a)(1)(A)(iii), by conduct which "knowing or in reckless disregard of the fact that an alien has

come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields

from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place,

including any building or any means of transportation."  The term "harbor" has been interpreted as

"conduct tending substantially to facilitate an alien's remaining in the United States illegally."  *See*

---

[10]Plaintiffs dedicate a considerable amount of their Response to arguing their "willful blindness" theory is sufficient to establish Defendants had actual knowledge at least ten of their employees were unauthorized to work in the United States and were brought into the country for purposes of illegal employment (Court File No. 467, pp. 16-24).  The statute at issue requires "actual knowledge," 8 U.S.C. § 1324(a)(3)(A), whereas the five cases Plaintiffs cited as authority for the sufficiency of a showing of "willful blindness" deal with statutes that require only "knowledge" (Court File No. 467, p. 17).  "Actual knowledge," requiring subjective belief that something is true, is a higher standard than "knowledge," which can be shown by willful blindness, a subjective belief that it is highly probable that something is true.  *United States v. One 1973 Rolls Royce*, 43 F.3d 794, 813 (3d Cir. 1994).  Indeed, one of Plaintiffs' cited cases expressly recognizes this distinction in dealing with a statute that did not require "actual knowledge."  *See Mester Mfg. Co. v. I.N.S.*, 879 F.2d 561, 567 (9th Cir. 1989) ("Mester had constructive knowledge, even if no Mester employee had actual specific knowledge of the employee's unauthorized status.")  This distinction between "actual knowledge" and "knowledge" is well-established.  *See, e.g.*, *United States v. Caseer*, 399 F.3d 828, 841 (6th Cir. 2005) (distinguishing "actual" and "constructive" knowledge).  Thus, Plaintiffs' theory of "willful blindness," without more, does not satisfy the "actual knowledge" requirement under 8 U.S.C. § 1324(a)(3)(A).

[11]This is particularly evident when one considers, to support their entire claim under 8 U.S.C. § 1324(a)(3)(A), Plaintiffs would need to provide evidence of at least ten illegal employees at each of Tyson's eight facilities at issue here for each of the twelve-month intervals over the nine-year period of the alleged violations (*see* Approved Class Notice, Court File No. 460, Appendix A).  This would require a showing of 720 illegal employees.

*Susnjar v. United States*, 27 F.2d 223, 224 (6th Cir. 1928); *United States v. Varkonyi*, 645 F.2d 453, 459 (5th Cir. 1981); *United States v. Lopez*, 521 F.2d 437, 441 (2d Cir. 1975); *United States v. Belevin-Ramales*, 458 F. Supp. 2d 409, 410-11 (E.D. Ky. 2006). Thus, Plaintiffs must provide admissible evidence such that a reasonable jury could find Defendants (1) committed actions to substantially facilitate an alien remaining in this country illegally and (2) did so with knowledge or a reckless disregard of the fact that the alien illegally entered or remained in the United States.

Plaintiffs allege Tyson harbored or concealed illegal immigrants working at the Tyson facilities by providing short-term and long-term housing, and warning unauthorized employees prior to inspections by the INS (Court File No. 467, pp. 24-25). Plaintiffs fail to provide admissible evidence sufficient to support their claims Tyson provides housing to illegal immigrants, but Plaintiffs provide one declaration of a former employee of Tyson at the Corydon, Indiana plant which supports their claim Tyson warned employees of INS inspections.

### a.     Short-term Housing

Plaintiffs allege Tyson provided short-term housing to immigrants, with knowledge they were illegal, to facilitate their continued presence in the United States illegally. Plaintiffs support this claim with the following exhibits:

First, Virginia Bravo, a legally-authorized Tyson employee, testifies she sought and was denied housing from a Mrs. Ahrazue because she was not an illegal immigrant (Court File No. 467, Exhibit UU, pp. 125-131). Ms. Bravo's testimony does not establish a foundation to show Tyson was behind this, nor have Plaintiffs provided a reason why Ms. Bravo's testimony as to what Mrs. Ahrazhue said to another person would not be excluded as hearsay.

Second, Idonyia McCoy testifies Tyson was providing housing to illegal aliens. However,

19

her testimony provides no admissible factual basis for how she knew certain Hispanic workers were illegal, or on what basis she believed Tyson provided certain individuals housing (*Id.*, Exhibit VV, pp. 73-74).

Third, Jacqueline E. Terrell drove Hispanic workers to motels and apartment complexes (*id.*, Exhibit EE, p. 1). Ms. Terrell testifies many of these workers did not have photo identification when they were given their physicals and drug tests, from which she presumes they were illegal (*id.*). She asserts Tyson gave the Hispanic workers money for obtaining housing, but provides no explanation of the basis for this assertion (*id.*). A bald assertion provides no evidentiary support and there is no indication what personal knowledge Ms. Terrell had. The Court does not know whether Ms. Terrell has personal knowledge sufficient to support this assertion, Fed. R. Evid. 602, or whether the basis of her knowledge is admissible evidence, e.g. Fed. R. Evid. 801. As a result, Mr. Terrell's testimony lends no support to Plaintiffs' claim.

Fourth, Donna Sanford, a former human resource employee at Tyson's Shelbyville, Tennessee facility from 1989-1998, testifies, "if asked, I directed Hispanic workers to local trailer parks where they could find housing" (*id.*, Exhibit WW, discovery number T-001504). This does not support Plaintiffs' claim, as Ms. Sanford does not state whether Tyson told her to do so, or whether the Hispanic workers were illegal aliens.

Fifth, Plaintiffs provide an exhibit labeled with the heading "Hispanic Recruiting," marked confidential, and bearing a discovery tag (*id.*, Exhibit XX). Plaintiffs state it is the amounts "Tyson paid Alabama motels to house "Hispanic workers"" (Court File No. 467, p. 25). Frankly, this Court has no idea what this document is or from where it came. Plaintiffs claim it is the money Tyson paid to house Hispanic workers. Even if properly identified and deemed admissible, Plaintiffs provide

no proof those workers were illegal aliens, and thus this evidence provides no support for Plaintiffs' claim.

Sixth, a Mr. Brunton testifies he drove some Hispanic Tyson employees to a trailer park on a few occasions (*id.*, Exhibit B, pp. 2618-19). He asserts no knowledge that the Hispanic employees were illegal aliens, nor does he provide a basis to infer it.

None of Plaintiffs' cited exhibits shows Tyson provided short-term housing to illegal immigrants.

### b. Long-term Housing

Plaintiffs allege Tyson assisted illegal immigrants in obtaining long-term housing, citing a news article stating Tyson launched a homeownership initiative for team members in conjunction with Freddie Mac (*id.*, Exhibit YY), and an exhibit appearing to be a bullet-point summary of Tyson's "Assisted Housing Program" (*id.*, Exhibit ZZ). Nowhere in either of these exhibits is there any indication the recipients or intended beneficiaries were or would have been illegal immigrants.

### c. Concealing Illegal Immigrants during INS Inspections

Plaintiffs allege Tyson concealed illegal employees by informing them when it learned the government might inspect the facility (*id.*, p. 25). Plaintiffs support this claim with the following exhibits:

First, Lori Windham, a former-Tyson employee from 1997 to 2003, testifies there was a rumor the INS were going to inspect the plant on the next day. The next day, Ms. Windham testifies the plant was "noticeably emptier than normal" as many of the Hispanic workers did not come to work (*id.*, Exhibit AAA, p. 1). A reasonable jury might be able to infer the Hispanic workers did not return to work due to the INS rumor. However, Ms. Windham provides no factual basis to infer

Tyson informed them of the potential inspection.

Second, Patricia Mims, an hourly worker at the Gadsden, Alabama facility from 1992-2000, testifies, if Tyson knew of INS inspections in advance, they would provide a green van to remove some of the illegal aliens from the premises (*id.*, Exhibit BBB, p. 1). Again, she provides no factual basis for this knowledge - the Court does not know whether Ms. Mims has personal knowledge sufficient to support this assertion, Fed. R. Evid. 602, or whether the basis of her knowledge is admissible evidence, e.g. Fed. R. Evid. 801. As a result, Mr. Mims' testimony lends no support to Plaintiffs' claim.

Third, Tracie G. Garrett testifies many illegal workers left the plant when an INS agent came to Tyson (*id.*, Exhibit CCC). Ms. Garrett does not imply Tyson informed the illegal workers of the presence of the INS.

Finally, Kelly Kessinger, a former second-shift, hourly employee at the Corydon, Indiana facility from 2002-2004, testifies on a number of occasions, management at Tyson would selectively inform certain illegal workers of impending INS inspections (*id.*, Exhibit CC, discovery number T-0050).[12] Ms. Kessinger *personally observed* Ruth Burell, a Tyson supervisor, walking around the plant before INS inspections with Dalia (the translator) and informing certain illegal aliens about the upcoming inspection (*id.*, discovery number T-0051). These individuals then would meet with Michelle Erp in the Human Resources office (*id.*). The illegal aliens who were informed by Ms. Burell were then absent from the Tyson facility during the INS inspection (*id.*). Ms. Kessinger estimates at least fifty illegal workers would be informed in this manner, then subsequently absent

---

[12]Plaintiffs incorrectly cited the Kessinger Declaration as Exhibit BB (*id.*, p. 25). It is Exhibit CC.

(*id.*).

### d. Conclusion

As previously discussed, Plaintiffs must provide admissible evidence such that a reasonable jury could find Defendants (1) committed actions to substantially facilitate an alien remaining in the United States illegally and (2) did so with knowledge or a reckless disregard of the fact that the alien illegally entered or remained in the United States. *See* 8 U.S.C. § 1324(a)(1)(A)(iii); *Susnjar*, 27 F.2d at 224; *Belevin-Ramales*, 458 F. Supp. 2d at 410-11. Ms. Kessinger testified she personally observed a Tyson supervisor inform certain illegal alien employees of impending INS inspections at the Corydon, Indiana facility, and that those same employees were not present for work during those inspections (Court File No. 467, Exhibit CC, pp. 1-2). *See* Fed. R. Evid. 602. Ms. Kessinger does not provide an explicit basis for her assertion the employees were unauthorized; however, a reasonable jury could infer that from the fact a Tyson supervisor warned certain workers of an INS inspection and those workers did not return to work for the inspection.

Thus, Plaintiffs have provided evidence sufficient to allow a reasonable jury to conclude Ms. Burell, a Tyson supervisor, and Ms. Erp, a Tyson Human Resources employee, informed unauthorized employees of INS inspections in order to conceal them from detection by the government. This creates a material factual dispute in the predicate offense under 8 U.S.C. § 1324(a)(1)(A)(iii), and thus makes summary judgment inappropriate on this element of Plaintiffs' claim concerning the Corydon, Indiana facility. However, Plaintiffs have failed to provide admissible evidence of harboring or concealing illegal aliens at the other Tyson facilities, and have provided no basis to infer Ms. Kessinger's observations were part of a pattern reenacted at every Tyson facility. As such, the Court will **GRANT** Defendants' motion for summary judgment on

Plaintiffs' RICO claims predicated on 8 U.S.C. § 1324(a)(1)(A)(iii) in relation to the Tyson facilities in Ashland, Alabama; Center, Texas; Gadsden, Alabama; Glen Allen, Virginia; Heflin, Alabama; Sedalia, Missouri; and Shelbyville, Tennessee (Court File No. 449).

### 3.    Injury and Causation

Having established sufficient evidence to avoid summary judgment for their RICO claim predicated on 8 U.S.C. § 1324(a)(1)(A)(iii) violations at the Tyson plant in Corydon, Indiana, Plaintiffs must satisfy the special requirements for a civil RICO claim, pursuant to 18 U.S.C. § 1964(c).  Plaintiffs must provide evidence to support (a) an injury to their business or property (b) by reason of the commission of the predicate offense.  The latter requirement is based upon the common-law foundations of proximate cause.  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 126 S. Ct. 1991, 1996 (2006).

### a.    Injury

Plaintiffs assert their wages were depressed.  This is a valid injury under 18 U.S.C. § 1964(c).  As the United States Court of Appeals for the Sixth Circuit held in this very case, "direct employees who receive too little [in wages]" assert a direct injury.  *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004) ("*Trollinger*"); *accord Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1286 (11th Cir. 2006).

### b.    Causation

To avoid summary judgment, Plaintiffs must provide evidence to establish a direct causal relation between their claimed injury, i.e. lost wages, and the predicate offense conduct, i.e. concealing illegal immigrants in the Tyson facilities from INS inspections.  *See Anza*, 126 S. Ct. at 1996; *Trollinger*, 370 F.3d at 622.  To do so, Plaintiffs are faced with a two-part causal chain, and

must provide sufficient evidence to establish each link, as follows: Tyson concealed illegal immigrants from government authorities by warning them of INS inspections, (1) which enabled Tyson to retain illegal employees, (2) which enabled Tyson to pay wages lower than the going market rate (the injury alleged by Plaintiffs). The Court considers both causal links, making all reasonable inferences in favor of Plaintiffs. *See Matsushita*, 475 U.S. at 587; *Eliadis*, 253 F.3d at 907.

### i.      Retaining Unauthorized Labor

According to Ms. Kessinger's testimony, a Tyson supervisor and her translator warned unauthorized employees of impending INS investigations at the Corydon, Indiana facility, allowing them to avoid detection (Court File No. 467, Exhibit CC, discovery numbers T-0050-51). According to her testimony, some fifty illegal alien workers were warned and avoided detection. Ms. Kessinger also testified these workers would return to work after the INS investigation was over (*id.*). Based upon Tyson warning the unauthorized workers and permitting them to return to work after the INS investigation, a reasonable jury could infer from this testimony that, at the Corydon, Indiana facility, Tyson was doing so to retain these unauthorized individuals for employment (*see id.*, discovery number T-0051). Thus, Plaintiffs have provided a sufficient evidentiary basis to show Tyson was able to retain illegal employees at the Corydon, Indiana facility by warning them of impending INS investigations.

### ii.      Lower-than-market Wages

To meet their burden at this causal link, Plaintiffs must show both that (a) Tyson was actually paying wages lower than the going market wage at the Corydon, Indiana facility, and (b) Tyson was able to do so because it was retaining its illegal employees through a pattern of concealment, in

violation of the predicate offense, 8 U.S.C. § 1324(a)(1)(A)(iii). As part of Dr. Borjas' analysis of Tyson's market power, he collected and compared wage rates at the Tyson facilities and at other employers he determined were similar with respect to geography and the type of employment they offered (Court File No. 412, Exhibit A, pp. 7-14). If a reasonable jury accepts Dr. Borjas' conclusions, that data would show the Corydon, Indiana facility was paying lower than the market wage.[13]

Plaintiffs must also provide evidence of a direct causal link between Tyson's lower wages and Tyson's retention of some illegal employees at the Corydon, Indiana facility. Even if a jury accepts Plaintiffs' arguments that their wages were depressed and Tyson retained unauthorized employees, that is not a sufficient basis for the jury to determine one caused the other - only that both occurred. Plaintiffs' expert, Dr. Borjas, could testify *generally* that the employment of illegal immigrants *can* cause a decrease in the wages paid to employees (Court File No. 500, p. 16). However, this is meaningless if Plaintiffs cannot provide evidence that retention of unauthorized employees caused the depression of wages *in this case*. Without such evidence, Plaintiffs' causation argument is purely speculative. *See Trollinger*, 370 F.3d at 614, 620.

Plaintiffs have filed to provide sufficient evidence to support this direct causal link.[14]

---

[13]This Court has already determined the credibility of Dr. Borjas' conclusions is an issue for the jury to determine in its capacity as the trier of fact (Court File No. 500, pp. 17-18).

[14]At the motion-to-dismiss phase, the Sixth Circuit court discussed the prospective burden of proof for causation at the summary-judgment phase. *Trollinger*, 370 F.3d at 619. These concerns have gone unanswered.

> There are many fact-driven questions here - e.g., Tyson's ability to influence the labor market in Shelbyville and the other cities where Tyson has a plant, the effect that the hiring practices of other businesses in Shelbyville and the other areas have on Tyson's ability to depress wages, and the effect of Tyson's alleged smuggling and employment of illegal aliens

Plaintiffs' causation argument is wholly speculative and fails to account for critical issues which fundamentally affect their causation burden of proof. As one example, Plaintiffs have provided no evidence as to the percentage of illegal aliens in the workforce. Whether Tyson's retention of illegal aliens directly caused the losses alleged by Plaintiffs is critically dependent upon the percentage of illegal aliens in Tyson's workforce.[15] If the fifty illegal aliens constituted a majority of the workforce, it is more plausible their presence had a significant impact on the wages of legal workers. If the fifty illegal aliens constituted only a small minority of that workforce, their presence is unlikely to have had any real effect.

As another example, Plaintiffs have not provided evidence to demonstrate whether the illegal

---

on the local union - and the speculativeness of our answers to all of them counsels against resolving the dispute as a matter of law at this early stage in the case.

It remains possible that plaintiffs may prove the following allegations in their complaint: (1) that Tyson hired sufficient numbers of illegal aliens to impact the legal employees' wages; (2) that each additional illegal worker hired into the bargaining unit by Tyson has a measurable impact on the bargained-for wage-scale; (3) that the illegal immigrants allegedly brought into this country through Tyson's efforts allowed Tyson not to compete with other businesses for unskilled labor; and (4) that Tyson's legal workers did not "choose" to remain at Tyson for less money than other businesses offered, but had no choice in the matter given the hiring needs of the other businesses in the area and the influx of illegal immigrants at Tyson's facilities. While Tyson's proximate-cause argument may well carry the day at the summary-judgment stage, it requires more assistance than the complaint alone provides.

*Id.*

[15] The lack of evidence as to what percentage of Tyson's workforce was comprised of illegal aliens is not only relevant to the more general issue of whether this factor directly lowered Plaintiffs' wages to some degree, but also fundamental to any determination of what portion of the wage depression was actually caused by the retention of illegal aliens. In determining damages, the Court would need to determine what portion of the wage depression was caused by the presence of illegal aliens, and then discount that by only considering the effect of the portion of those illegal aliens who were able to be retained due to Tyson's concealment efforts. This requires the kind of highly speculative damage calculations which implicate fundamental causation concerns, as specifically recognized by the Supreme Court in *Anza*. 126 S. Ct. at 1998.

aliens were members of the local union.  The presence of a union could severely distort the causal link between Tyson's retention of illegal aliens and Plaintiffs' injury, due to the union's potentially pivotal role in negotiating wages with Tyson.[16]  If the illegal aliens were not members of the local union, but they made up only a small percentage of the workforce, then their numbers should have little impact upon the union's bargaining power and leverage, and Tyson's perception of that power.  If their numbers are large, however, and they are not members of the union, this should have a deleterious impact upon the union's bargaining power and leverage, and Tyson's perception of that power.

As a third example, Plaintiffs have provided no evidence as to the length of time the illegal workers had been at Tyson.  The longer they had been in Tyson's employment, the more likely their presence impacted wages.

Ultimately, Plaintiffs' speculative chain of causation is plagued by the possibility of intervening causes, which Plaintiffs have not addressed.  *See Trollinger*, 370 F.3d at 614, 619.  If the jury accepts Plaintiffs' claim that Tyson paid less than the going-market wage, Plaintiffs have provided no evidence the retention of illegal alien employees permitted Tyson to do so.  Tyson may

---

[16]The Sixth Circuit, in ruling in this case, stated "the union's role in negotiating wages may well prove to attenuate the chain of causation to the breaking point." *Trollinger*, 370 F.3d at 619. Plaintiffs have not accounted for the potential causal distortion of the collective-bargained, wage negotiations between a Tyson facility and the union.  This is of significant causal concern, because the wages are not set directly by Tyson, but are a result of wage negotiations with union representatives (Court File No. 450, p. 7).  These negotiations occur several years prior to the negotiated wages taking effect, and are generally negotiated in four-year blocks (*id.*, p. 6).  Plaintiffs have provided no evidence of how authorized employees' wages were depressed in spite of union representation, or to what extent this representation did, or did not, mitigate the wage depression Plaintiffs allege occurred due to Tyson's concealing and retaining unauthorized workers.  Without evidence, this Court cannot, and a reasonable jury could not, simply assume the union had no effect on the causation elements of Plaintiffs' wage depression.

have been able to pay lower wages because people were willing to work for Tyson for a lower wage due to Tyson providing better benefits, more job security, or a more convenient location; or, because the worker's union was out-negotiated when wages were set, or pursued other interests at the negotiation more rigorously than the hourly wage rate. Plaintiffs have made no effort to address these potentially-material intervening causes, and there are likely others. *Cf. Anza*, 126 S. Ct. at 1997 (discussing the problems that arise when causation is too remote and speculative, lacking case-specific evidence).

### iii.    Conclusion

Plaintiffs have failed to provide any direct evidence Tyson's concealment and retention of illegal employees depressed their wages, as required pursuant to 18 U.S.C. § 1964(c). The only causation evidence Plaintiffs have provided is generalized speculation, without the specific factual basis needed to tie the theory to this case. *See Trollinger*, 370 F.3d at 619-620. As such, this Court will **GRANT** Defendants' motion for summary judgment on Plaintiffs' RICO claims predicated on 8 U.S.C. § 1324(a)(1)(A)(iii) in relation to the Tyson facility in Corydon, Indiana (Court File No. 449).[17]

---

[17]Plaintiffs' RICO claims predicated on 8 U.S.C. § 1324(a)(3)(A) and § 1324(a)(1)(A)(iii) at the other Tyson facilities would also be appropriately dismissed based upon Plaintiffs' failure to establish direct causation, had those claims not been dismissed on other grounds.

**IV.    CONCLUSION**[18]

Plaintiffs alleged RICO offenses predicated on two immigration offenses - 8 U.S.C. § 1324(a)(3)(A), (a)(1)(A)(iii).  Plaintiffs failed to produce evidence to demonstrate the presence of at least ten unauthorized employees at any given Tyson facility, and thus failed to satisfy their burden of proof under 8 U.S.C. § 1324(a)(3)(A).  Plaintiffs failed to demonstrate Tyson was harboring or concealing illegal aliens at its facilities in Ashland, Alabama; Center, Texas; Gadsden, Alabama; Glen Allen, Virginia; Heflin, Alabama; Sedalia, Missouri; and Shelbyville, Tennessee. Plaintiffs submitted the declaration of Ms. Kessinger, which provided a basis for a jury to find Tyson was concealing unauthorized employees at its Corydon, Indiana facility.  However, Plaintiffs failed to provide evidence to show Tyson's violations of 8 U.S.C. § 1324(a)(1)(A)(iii) proximately caused their injuries.  As a result, this Court will **GRANT** Defendants' motion for summary judgment, and **DISMISS** Plaintiffs' claims with prejudice.

An Order shall enter.


**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[18]Because Plaintiffs failed to provide sufficient evidence to oppose Defendants' motion for summary judgment, as explained above, this Court does not have occasion to consider whether Plaintiffs satisfied their burden as to the requirements of their RICO offenses under 18 U.S.C. § 1963(c), (d).